HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 12988–78, 13183–78.     Filed September 21, 1983.

*William Waller, Teresa H. Johnson, James T. O'Hare*, and *Charles L. Kown*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

PARKER, *Judge*: In docket No. 12988–78, respondent determined deficiencies in Federal income taxes of $6,789,289.25 for 1972 and $22,398,355.65 for 1973. In docket No. 13183–78, respondent determined deficiences as follows:

| Petitioner | 1969 | 1970 | 1971 | |
|---|---|---|---|---|
| Broadway Hospital, Inc. | $2,341 | $2,522.00 | $6,305 | |
| Community Hospital | | 7,858.00 | | |
| Crestwood Hospital Nursing Home, Inc. | 377 | 141.00 | 351 | |
| Detar Hospital, Inc. | | | | $6,895 (4/30/72) |
| Detar Properties, Inc. (merged into Detar Hospital, Inc.) | | | 34 (8/31/71) | 96 (8/31/72) |
| Diagnostic Center Hospital Corp. of Texas | | | 12,692 | |
| Doctors Hospital of Mobile, Inc. | | 11,331.00 | 28,327 | |
| Donelson Hospital, Inc. | | | 19,719 | |
| Great Southwest General Hospital | | 2,328.00 | 5,819 | |
| Hospital Corp. of America | 99,993 | 91,424.00 | 159,525 | |
| Hospital Corp. of America—West (merged into Hospital Corp. of America) | | | 265 | |
| Shields Products, Inc. (merged into Hospital Corp. of America) | 959 (11/30/70) | 2,030.00 | 5,076 | |
| Hospital Development and Services Corp. | | | | 18,019 (6/27/72) |
| Johnston-Willis Hospital, Inc. | 4,373 | 7,004.00 | 17,510 | |
| Lewis-Gale Hospital, Inc. | 44,145 | 59,232.00 | 38,898 | |
| McMinnville Hospital, Inc. | 722 | 1,171.00 | 2,928 | |
| Pasadena Bayshore Hospital, Inc. | 1,635 | 2,864.00 | 7,160 | |
| Physicians General Hospital d.b.a. Arlington General | 557 | 1,687.00 | 4,217 | |
| Raleigh General Hospital | 141 | 29,881.00 | 73,965 | |
| Rio Hondo Memorial Hospital | | 309.00 (10/31/70) | 2,896 (10/31/71) | 4,416 (6/21/72) |
| Ross General Hospital | 935 | 1,814.06 | | |
| Smith County Hospital, Inc. | 195 | 358.00 | 896 | |
| Sun Towers, Inc. | 1,278 (6/30/70) | 1,764.00 | 4,410 | |
| Ukiah General Hospital, Inc. | 429 | 652.00 | 1,630 | |

All of the adjustments in the separate notices of deficiency issued to each of the petitioners in docket No. 13183–78, and all but one of the adjustments in the notice of deficiency issued in docket No. 12988–78, have been resolved by agreement of the parties. The issues remaining for decision concern the adjustment to foreign income. The questions presented are:

(1) Whether the Cayman Islands subsidiary is a "sham" corporation so that all of its income for the year 1973 is attributable to Hospital Corp. of America under section 61;[1]

(2) Whether property in the form of the contract to manage the King Faisal Specialist Hospital in Riyadh, Saudi Arabia, was transferred by Hospital Corp. of America to its Cayman Islands subsidiary in 1973 without obtaining an advance ruling pursuant to section 367;

(3) Whether Hospital Corp. of America received stock in its Cayman Islands subsidiary as compensation for services; and

(4) Whether some or all of the 1973 income of the Cayman Islands subsidiary should be allocated to Hospital Corp. of America under section 482.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

### Petitioner's Organization and Operations

Hospital Corp. of America (hereinafter referred to as HCA or petitioner) maintained its principal offices in Nashville, Tenn., on the date the petition was filed. During the years in question, the stock of HCA was publicly held and traded on the New York Stock Exchange. For each of the years ended December 31, 1972, and December 31, 1973, HCA and its domestic subsidiaries filed a consolidated U.S. Corporation Income Tax Return, Form 1120, with the Internal Revenue Service Center at Memphis, Tenn.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue, unless otherwise noted.

Petitioner was incorporated in 1960 under the laws of the State of Tennessee as Park View Hospital, Inc. In 1968, it joined with 11 other hospitals to form Hospital Corp. of America. HCA's founders were Jack C. Massey, Dr. Thomas F. Frist, Sr., and Dr. Thomas F. Frist, Jr. HCA's management views the primary objective of the HCA hospitals as the delivery of the highest possible quality of health care at a reasonable cost.

After 1968, the HCA organization expanded rapidly, and by March 31, 1973, petitioner and its subsidiaries operated a total of 49 hospitals in 12 states. Petitioner and its subsidiaries owned 41 of these hospitals. Petitioner operated those hospitals that it did not own under management contracts. In 1970, HCA had only two such management contracts, and in 1972 had four such management contracts. In 1973, HCA initiated "a new program of actively soliciting additional hospitals under management contracts." Petitioner was attracted by the potential for increased profits without significant capital investment. Moreover, management of existing hospitals under contract offered petitioner a faster means of expansion than the construction of new hospitals. These management contracts were generally entered into by HSP, Inc., a subsidiary of petitioner.

Petitioner began soliciting and negotiating for management contracts across the United States. Dr. Frist, Jr., was the person primarily involved in this solicitation and negotiation. His role was that of a salesman selling the concept of a hospital management contract. Part of this concept involved long-range planning and management skills. The sales pitch used was petitioner's track record in successfully managing many hospitals throughout the United States.

In selling the concept of hospital management, HCA asserted that the problems hospitals faced were primarily in management. Traditionally, health care facilities had been operated by tax-supported community or religious hospitals managed by civic groups. HCA pioneered in bringing efficiencies of business management into the operation of hospitals. Petitioner offered expertise in managing the hospitals, while at the same time leaving the medical care to the medical staff. Petitioner's areas of expertise included establishing good relationships with the medical staff, financial controls, ac-

counting, and staffing. Petitioner also provided the advantages of group purchasing, the opportunity for consultation among peers, the sharing of ideas and methods, and assistance with long-range planning.

Petitioner compiled some of its expertise, particularly in accounting and finance, into a series of manuals which in later years were copyrighted.[2] The manuals were furnished to the hospital administrators for assistance in running the hospitals. The hospital administrators were not required to use these manuals, and some of the administrators developed their own supplements or tailored their manuals to the local situation at their particular hospital, if they found it appropriate to do so. However, either the manuals or at least the information and expertise incorporated in such manuals were always available in some form to the hospital administrators.

Petitioner preferred to decentralize certain aspects of its operations. Thus, as the HCA organization expanded, petitioner generally operated each of the hospitals it owned through a subsidiary corporation. However, many aspects of the HCA organization were run from the Nashville headquarters. Petitioner decided that business risks and potential liabilities could be handled more prudently in the form of a separate corporate structure for each HCA-owned hospital. Each hospital was thus to be insulated from the parent corporation and from the other hospital corporations. The use of subsidiary corporations was intended to make it easier to assign responsibility for the successful operation of each hospital, without detracting from the advantages of large-scale purchasing, recruiting personnel, sharing certain specialized skills among several hospitals, and other benefits inherent in the operation of a large group of facilities.

Petitioner also wanted its hospitals to retain their local image. Many of the cities in which petitioner operated were of moderate or small size. The local hospital was therefore an important facility in the community, especially as a source of employment. One of the ways in which the local identity was

---

[2] The manuals were titled Volume I, Shared Applications, Operations and Maintenance; Volume II, Shared Applications, Patient Accounts; Volume III, HCA Services Information Systems, Shared Applications, General Accounting; Volume IV, Shared Applications, Health Care Administrative Services.

retained was by using a local name to reflect some characteristic of the community or a name selected in an employee contest. HCA's management wanted to avoid the appearance that the local hospital and the company operating it were part of a large national organization. Petitioner tried to foster and encourage feelings of local participation and involvement. This impression of local autonomy and local identity helped insure the cooperation and assistance of the local physicians who were the main users referring patients to the hospital. Petitioner viewed this local identity as one of the reasons for its success. However, the record does not indicate the extent to which local identity was stressed in hospitals operated under management contracts since the sales pitch to those hospitals was the management skills and expertise available to HCA as a national organization.

Since each HCA-owned hospital was treated as a local enterprise, most of the important day-to-day operating decisions were made at the subsidiary level by a local board of directors. Each HCA-owned or operated hospital had its local administrator, financial officer, and director of nursing. Petitioner considered these jobs to be the three key management positions in any hospital.[3] The local management staff received guidance from the HCA headquarters in Nashville and from HCA's regional or division vice presidents, but ran the hospital on a day-by-day basis, thereby retaining the hospital's seeming local identity and autonomy.

Since at least 1969, petitioner had used a type of intercompany account for its domestic subsidiaries for allocation to the subsidiaries of expenses of overhead incurred in the Nashville headquarters. Overhead expenses incurred in Nashville were then reflected in both the subsidiary's and petitioner's records, but this allocation was simply made by means of a management fee based on estimated patient days at the particular hospital. The record does not establish that this management fee based on estimated patient days clearly reflected the expenses of the services rendered by the parent corporation.

---

[3] In hospitals owned by petitioner or one of its subsidiaries, all three persons were employed by petitioner or the subsidiary. In hospitals operated by petitioner under a management contract, petitioner usually filled these three positions with its own personnel but might occasionally retain a financial officer already on the hospital staff, if the person was found to be qualified.

Other than the above intercompany accounts, no evidence was presented that petitioner, in 1973, maintained any formal intercompany accounts to reflect the services rendered by the parent corporation to its domestic subsidiaries. Also, the record does not indicate the type of records maintained by HSP, Inc., in regard to the non-HCA-owned hospitals operated under management contracts or whether there were any formal intercompany accounts for services rendered by the parent corporation to those hospitals.

Each hospital was also assigned to a division or region headed by one of petitioner's regional or division vice presidents. The regional vice presidents worked very closely with the hospital administrators in coordinating activities and dealing with problems. Each division or regional vice president was responsible for operations of the hospitals within his area. The division vice presidents and the hospital administrators whom they directed had access to specialists in various fields from HCA's corporate offices in Nashville, as well as access to regional consultants from other hospitals that petitioner operated. This sharing of management expertise, technical skills, and human resources was one of the great strengths of petitioner's hospital management system.

The division or regional vice presidents, together with Robert P. Brueck, a senior vice president, and Andrew W. Miller, vice president and controller, constituted petitioner's operations committee.[4] Brueck was head of the operations committee. The responsibilities of the operations committee were to formulate basic policies and solve problems of an operations nature and to review progress of the hospital groups. The operations committee met regularly for discussion and review of financial results from the hospitals.

The chain of authority for the actual operations of the hospitals thus started with Brueck, ran through the divisional vice presidents, and down to the local hospital administrators. The local administrator had some flexibility in the operation of his hospital. There were, however, regular meetings with the division vice president during which problems and solutions could be compared. Some of petitioner's success depended

---

[4]Brueck was also a member of petitioner's board of directors and petitioner's executive committee.

upon the personal relationships between the division vice presidents and the local administrators. Quality control was directed from the regional level, and there was a limit on the number of hospitals handled by each division vice president. The medical standards for quality control in the hospitals were insured by accreditation by the Joint Commissioner of Accreditation Hospitals and by opinions of the hospitals' medical staffs concerning the quality of health care.

The executive committee of petitioner's board of directors consisted of Jack C. Massey, chairman of the board of directors; Thomas F. Frist, M.D., vice chairman and chief medical officer; John A. Hill, chairman of the executive committee; Robert Anderson; Millard Bartels; Robert P. Brueck, senior vice president; Thomas F. Frist, Jr., M.D., executive vice president; C. George Mercy, vice president; John C. Neff, president; Richard S. Perkins; and Carl E. Reichardt. Petitioner's officers generally served in their same capacity as officers of each subsidiary corporation in order to readily identify the officers of the subsidiary corporation. Thus, the president of HCA, Mr. Neff, was also the president of each of the subsidiary corporations. The executive vice president of HCA was usually the vice president of each subsidiary corporation; the treasurer and secretary of HCA was also usually the treasurer and secretary of each subsidiary corporation.

*The King Faisal Specialist Hospital*

In November 1972, John C. Neff received a telephone call from one Ted Crofoot asking whether petitioner would be interested in managing a hospital in Saudi Arabia. Neff expressed interest in discussing the matter further, so a breakfast meeting in Nashville was set up for the following week. Present at this meeting were Neff, Frist, Jr., Crofoot, and one Joe Dini. Dini identified himself as an American citizen working in Saudi Arabia, who had many contacts there and wanted to serve as a general "go between" to bring together representatives of the Saudi Arabian hospital and petitioner. Dini represented that he had the ability to deliver the management contract to HCA or to someone else. Dini, however, expected a finder's fee for making this introduction. At the meeting, Neff told Dini that any expenses for exploring

the possibility of a management contract would have to be paid by the Saudis. Neff indicated that petitioner was interested only in a "cost plus" arrangement, in other words, that the actual cost of operating the hospital would be paid by the Saudi Arabian Government, to which would be added a percentage for petitioner's profit, thus making it, as to petitioner, a "riskless venture."

After the meeting, Dini was given financial reports, photographs of HCA hospitals, and an HCA promotional film to present to the representatives of the Saudi Arabian Royal Cabinet. He was also given a letter prepared by Donald W. Fish, petitioner's "in house" counsel, authorizing Dini to arrange for negotiations of a contract under which petitioner or its "affiliated corporation" would manage the Saudi Arabian hospital. Any payment to Dini for his services was contingent upon execution of a management contract.

The Saudi Arabian hospital that Dini mentioned at the Nashville meeting was the King Faisal Specialist Hospital (hereinafter sometimes the King Faisal Hospital or KFSH), which was then under construction in Riyadh, Saudi Arabia. The decision to build the KFSH resulted from several factors. Saudi Arabian nationals were entitled to free hospital and medical care, so when a medical problem developed that could not be treated in Saudi Arabia, the Kingdom sent the patient to England or the United States and paid the full cost of the care. The Saudi Arabian officials discovered they were spending a lot of money sending their nationals out of the country for medical care and many nationals took "medical vacations." The Saudi officials therefore saw a need for a specialist hospital in Saudi Arabia to serve patients referred from other Saudi hospitals. Furthermore, the Ruler of Saudi Arabia, King Faisal Bin Abdul Aziz, was not well and had made several trips to the United States for medical attention. In part, the hospital was to be built to provide a facility he could use if his health so required. The Queen also became interested in the hospital and planned to have it commissioned as a monument to King Faisal and a gift to the people of Saudi Arabia. She envisioned it as an outstandingly equipped hospital and a "Mayo Clinic" of the Middle East. While all other hospitals in Saudi Arabia were directed by the Minister of Health, the KFSH was being built by, and was accountable to, the private

office of the King with orders "to make it the finest hospital with the newest equipment of any hospital in the world." The idea of the hospital was to bring technology to the Kingdom of Saudi Arabia, and money was virtually of little concern in this project.

The KFSH was designed to accept only referral patients. It was to house 250 private beds. The hospital was to be part of a totally self-contained community that would have apartments, swimming pool, tennis courts, its own power and water supply, security system, and a closed-circuit television system and production studio. The hospital was to have a complete network of the latest in computers. The computers were to connect all phases of the hospital's operation: the business office, admitting, patient history, laboratory, x-ray, research, nuclear medicine, dietary system, and the nursing system.

Dr. Rifat Alsayed Ali (Dr. Rifat), an Egyptian who was the King's personal physician and who was also married to a sister of the Queen, was in charge of the planning, supervision, coordination, development, and construction of the KFSH. He had employed Dr. Kenneth Williams from England as his special assistant for the KFSH project. On February 3, 1973, Dr. Rifat invited representatives from HCA to come to Saudi Arabia to discuss the management of the KFSH. The letter of invitation was addressed to Jack C. Massey, chairman of HCA, and specifically stated that the meeting would be without commitment of either side.

In late March or early April of 1973, John A. Hill, a former president of HCA, who was in Greece at that time, was asked by HCA to go to Saudi Arabia to investigate the possibility of petitioner's managing the hospital. Hill stayed in Riyadh for about 19 hours, during which time he met with Joe Dini and Dr. Rifat, and visited the hospital. His discussion with Dr. Rifat was very general concerning the problems involved in construction of the hospital, which was only about 40-percent complete and which was behind the construction schedule. Dr. Rifat was concerned about whether the hospital could attract well-qualified foreign physicians to Saudi Arabia. No discussions as to either price or terms of a potential management contract occurred during this visit. Hill's trip was purely exploratory, to investigate Dini's suggestion that a business opportunity was available. Hill's instructions were merely to

look around and see whether further discussions were warranted. Hill did not have any authority to negotiate a contract for petitioner. During this visit, however, a new agreement was made between Joe Dini and petitioner under which Dini would serve as a consultant for the purpose of arranging negotiations leading to a contract to manage KFSH. The terms of this agreement provided for Dini to receive 6 percent of the total value of the contract.

Hill returned from Saudi Arabia enthusiastic about pursuing discussions concerning the management contract. He thought the project would be difficult, unique, and prestigious. Petitioner arranged to send a team to Saudi Arabia to make a more thorough investigation and analysis of the KFSH. The members of this HCA team were Dr. Thomas F. Frist, Jr., C. George Mercy, and Thomas W. Todd. Each was specifically chosen based upon his ability to provide analysis in different areas of expertise. Dr. Frist, Jr., represented the founders of HCA. His expertise was in the medical aspects of HCA and relationships between doctors and medical staffs. Mercy was involved in operations and financial management. He had had overseas experience and had managed an HCA hospital and an HCA division or region. Todd was a senior man in personnel work and had extensive experience in recruiting personnel, which was expected to be the major problem in any contract to manage the King Faisal Hospital.

The HCA team stopped in Rome and met Dr. Kenneth Williams. From Rome, Dr. Williams and the HCA team went to Riyadh, Saudi Arabia, and spent the first week of May there. In Riyadh, the study team met with both Dr. Rifat and Dr. Williams, toured the KFSH, and examined the country of Saudi Arabia to gain impressions of what it would be like to do business there.

Both Dr. Rifat and Dr. Williams were concerned about the tasks of operating and staffing the KFSH. At one of the meetings, it was made clear to the HCA team for the first time that Dr. Rifat and Dr. Williams did indeed plan to contract to have someone manage the hospital. During this time, the issue of Dini's compensation also arose. Dr. Williams was particularly concerned about the sum Dini was to receive, and at some point it was made clear that there would be no management contract unless Dini was removed from the picture. The HCA

team offered Dini a settlement offer of $100,000 plus expenses, which he refused at that time.[5]

Dr. Rifat and Dr. Williams planned to meet with various contractors of the KFSH in London late in May of 1973. Dr. Rifat suggested that the HCA team be there as well. He also suggested that any proposals for a contract include subcontracts with American Hospital Supply (AHS) and Scientific Controls Systems, Ltd. (SCICON). AHS was already under contract with the Kingdom of Saudi Arabia to furnish certain

---

[5]Reporting on this early May trip to Saudi Arabia, Dr. Frist, Jr., advised HCA headquarters that:

"The next morning George related to Tom and me privately that Dr. Rifat had broached the financial arrangements with him to a limited extent insisting upon the fact that he was not to get any cut but that several "high-up" persons close to the King would expect to get a 10% fee based on the total operating cost annually. He further said that Dini only worked for a son of the King and would not be entitled to possibly more than 1% yearly of the deal, if anything. George further stated that at the proper time, Dr. Williams and George would sit down with Dini to get this straight. * * * "

　　*　　　*　　　*　　　*　　　*　　　*　　　*

"There is much behind-the-scenes maneuvering and actually intrigue among members of the Royal family, and particularly the princes who are further down the line. In this case, Dr. Williams feels quite confident that Dini does not have contacts of any significance. In fact, he revealed for the first time, and quite possibly learned this himself for the first time, that probably the key person behind Dr. Rifat and the group with whom we will be dealing as far as commission, is the Queen herself. We spent a great deal of time discussing why such arrangements are made within the country and tolerated. We went into the structure of the Royal Cabinet and how, when King Faisal came into power, he set up a government for the first time with a Department of Finance, Department of Health, Department of Education, etc. with budgets and royal cabinet which actually functions. While he has the final word, this has left him and the Royal family with somewhat limited control of the money and very few ways to maintain or see their wealth grow personally. On the other hand, they are seeing many people in the middle class through maneuvering behind the scenes and kickbacks, developing quite strong financial positions themselves. Therefore, in many ways it is important for the Royal family, and particularly the seven brothers of King Faisal and their close relatives, to have means of channeling funds back to them personally. This is done through corporations which they set up outside the country which take commissions on the various contracts which are signed. Obviously, there are many people who are trying to get into the act on such contracts. It appears as if Dr. Williams is not involved in any of this; certainly neither his life style nor his conversation give any indication to the contrary."

On June 27, 1973, Frist, by letter, tried to force Dini to accept a settlement of $5,000 which Dini refused. Frist's letter stated that Saudi Arabian officials told him that Dini did not have the alleged authority to represent King Faisal in securing the management contract and that no further negotiations regarding the contract would be possible until Dini was out of the picture. On August 28, 1973, after the contract was executed, Neff and Dini agreed that Dini would receive $400,000 in full settlement of any past agreements between petitioner and Dini. The terms of the settlement called for a payment of $150,000 on Oct. 1, 1973, $50,000 on May 1, 1974, and $50,000 per year on each September 1 for the next four years. Neff thought it was important to "get him out of the way of any kind of problem in Saudi Arabia."

equipment and supplies to the KFSH. SCICON was an English company that already had a contract with the KFSH to sell and oversee all of the computer systems.

The HCA team returned to the United States and pursued their investigation of the project. On May 22, 1973, Neff, Mercy, Frist, Jr., Todd, and Robert McCullough met in Chicago with representatives of AHS. The purpose was to learn more about AHS's working relationships, contractual relations, and other general impressions about working at the KFSH.

*Formation of the Cayman Islands Corporations*

HCA had decided at the outset that it would not become directly involved in international operations. HCA's management and staff were fully occupied and feared that international operations would drain and dilute their domestic efforts. In November and December 1972, petitioner had considered involvement in hospitals in several European countries. The most extensive investigation concerned a hospital to be built in Athens, Greece. The preparations for this project went so far as to take an option on land in Greece and to draw up articles of incorporation for a subsidiary of petitioner to be formed in Greece. HCA always thought that operations in foreign countries would be pursued through foreign corporations, all of which would be under the umbrella of a major foreign corporation. This was consistent with HCA's use of HSP, Inc., a domestic subsidiary, to handle its management contracts for hospitals in the United States.

Petitioner decided to form two corporations in the Cayman Islands, a parent and a subsidiary corporation. There were several reasons for incorporating in the Cayman Islands: the islands were an English-speaking jurisdiction with familiar corporate codes; they had a stable government; they were readily accessible to the United States; and they imposed no corporate income taxes, if certain conditions were met. The use of a separate corporation to handle the KFSH management contract was generally consistent with petitioner's usual policy of using separate corporations for its HCA-owned hospitals for purposes of identifying the profit picture, assigning responsibility, and limiting liabilities. However, the management contracts with non-HCA-owned hospitals had been handled by HSP, Inc., and the record does not indicate that

separate corporations had been set up to handle each management contract in the United States. Tax consequences under both U.S. and Cayman Islands laws were considered in deciding to incorporate there.

Petitioner hired W. S. Walker & Co., of Georgetown, Grand Cayman, a Cayman Islands law firm, to arrange the incorporation of the two corporations. Robert G. McCullough, a member of the law firm representing petitioner in Nashville, was also involved. The new corporations were named Hospital Corp. International, Ltd. (HCI One), and Hospital Corp. of the Middle East, Ltd. (LTD). HCI One was to be the umbrella corporation for all of petitioner's foreign operations. LTD was to be in charge of negotiating, executing, and performing any contract to manage the King Faisal Hospital. HCI One was a first-tier wholly owned subsidiary of petitioner and LTD was a wholly owned subsidiary of HCI One and, therefore, a second-tier subsidiary of petitioner.

The Cayman Islands corporations were formed and registered on May 28 and May 29, 1973. Each corporation had capital stock of $1,000, paid in cash. The two corporations were formed and registered as exempt companies under the Companies Law, section 179, which required that the objects of the company be carried out mainly outside the Cayman Islands. The memoranda of association for both corporations specifically provided that neither corporation will "trade in the Cayman Islands with any persons, firm or corporation except in furtherance of the business of the Company carried on outside the Islands." No income tax was imposed by the Companies Law of the Cayman Islands, under which HCI One and LTD were formed.

On May 31, 1973, HCI One elected John C. Neff, Robert P. Brueck, Thomas F. Frist, Jr., and Alice Mae Coe as directors.[6] On July 6, 1973, C. George Mercy and Thomas W. Todd were also elected as directors. The officers of HCI One were Neff as president; Todd as vice president; Donald W. Fish as secretary; and Samuel A. Brooks, Jr., as treasurer. Neff and Fish were elected May 31, 1973. Todd and Brooks were elected October 24, 1973.

---

[6]Alice Mae Coe served as director for 1 day only.

In 1973, the directors of LTD were John C. Neff, Robert P. Brueck, Thomas F. Frist, Jr., C. George Mercy, and Thomas W. Todd.[7] The officers of LTD elected on May 31, 1973, were John C. Neff, president, and Donald W. Fish, secretary. On July 1, 1973, Cayhaven Corporate Services, Ltd., was elected as assistant secretary. On October 24, 1973, LTD elected Thomas W. Todd as vice president, Samuel A. Brooks, Jr., as treasurer, and Fred A. Hurd, Jr., as comptroller. Neff, Fish, Todd, and Brooks served for HCA in the same respective office. Hurd was assistant treasurer of petitioner.

LTD maintained its legal offices in the Cayman Islands with W. S. Walker & Co., the law firm that prepared the incorporation documents. When board meetings or stockholders' meetings were held in the Cayman Islands for HCI One or LTD, such meetings were held at a local Holiday Inn. LTD kept minutes of meetings held by its shareholders and board of directors. Statutory responsibility for maintaining the minutes was lodged in Donald W. Fish, secretary of LTD. Fish sometimes delegated the responsibility for the preparation of the minutes to W. S. Walker & Co., LTD's legal agent in the Cayman Islands, to the Nashville law firm that represented petitioner, and to other individuals in Fish's office.

The LTD minutes thus prepared reflect that from May 31, 1973, through December 31, 1973, there were several meetings of the board of directors: four held in the Cayman Islands, and the remainder held in Nashville. At these meetings, officers, directors, and alternate directors were selected; depository and signing resolutions for the First National City Bank, Grand Cayman, were adopted and approved; and additional shares of stock were issued to HCI One.[8]

---

[7]Neff, Brueck, and Frist were elected May 31, 1973. Mercy and Todd were elected July 6, 1973. On May 31, 1973, Alice Mae Coe was elected as a director for qualification purposes and served for only 1 day. She was also one of the original subscribers of LTD stock.

[8]In years after 1973 and up to at least June 19, 1980, there were regular and special meetings of directors, annual shareholders' meetings, and annual directors' meetings for LTD. These meetings took place in both Nashville and the Cayman Islands. The subjects of these meetings included: election of officers and directors; the acquisition of stock in an Australian company, the loan of money to that company, and later decisions to inject more money into that Australian company; establishment of bank accounts and the approval of bank depository and signing resolutions; investment of LTD funds; arranging for terms of officers and directors who terminated their employment; arranging powers of attorney; arranging the contract regarding the landscape development program for the King Faisal

*Formulating the Management Contract Proposal*

On May 26, 1973, Todd, Frist, Jr., and Mercy were sent to London. They were accompanied by Robert G. McCullough, an attorney with a law firm in Nashville that represented petitioner. McCullough had prepared a draft of an interim agreement that the HCA team planned to present to representatives of KFSH. The draft was designed to be used as a working document in the event negotiations were conducted and resulted in a tentative agreement. It was hoped that an interim agreement could be reached covering the 120-day period beginning July 1, 1973. During that time, it was contemplated that the final operating agreement would be prepared. While in London, McCullough made a telephone call to Nashville to confirm that the two Cayman Islands corporations had been formed.

One of the purposes of the HCA team in going to London was to meet with representatives of Scientific Control Systems, Ltd. (SCICON), the prime contractor for the building of the King Faisal Hospital. The SCICON representatives were Jim Brennan, the chairman, and David Futcher, general manager of Consulting Services, one of the SCICON divisions. SCICON had entered into a contract with the Royal Cabinet of the Kingdom of Saudi Arabia to supply computer systems for the KFSH. The HCA team learned from Jim Brennan that SCICON had no intention of managing the hospital, as the company thought that was beyond its expertise. SCICON wanted only a subcontractor arrangement with respect to the computer system of the hospital, and was eager for a company with the reputation of Hospital Corp. of America to provide hospital management services. Several discussions led the parties to believe that they would be able to work well

---

Hospital; resolutions concerning formal contracts and extensions of contracts between LTD and petitioner and between LTD and HCI Two concerning recruitment, investment of LTD funds, purchases for LTD, and finder's fees; approval of corporate policy concerning, among other things, conflicts of interest, political contributions, integrity of financial reporting, and prohibition of other improper payments; Foreign Corrupt Practices Act; and the establishment and adoption of an employees' benefit plan. The minutes also contain a record of LTD's shareholders from the original issuance of stock.

together, so a letter agreement between LTD and SCICON was signed May 31, 1973.[9]

This LTD-SCICON agreement stated that in the event LTD was awarded a management contract for the King Faisal Hospital, SCICON would work as a subcontractor and provide technical services relating to the computer operations. The functions that SCICON were to perform included, but were not limited to, computer equipment services, software services, patient data services, and client liaison. The price and payment terms were to be negotiated at a later time.

The members of the HCA team had expected that Dr. Rifat would be in London at this time. However, the only representative of the KFSH present in London was Dr. Kenneth Williams, who did not have authority to negotiate a contract on behalf of the hospital. For this purpose, it was necessary to meet with Dr. Rifat, who was then in Geneva.

Dr. Williams suggested that the HCA team go to Geneva in the hope of meeting with Dr. Rifat. McCullough returned to the United States but the rest of the team went to Geneva. They arrived in Geneva on Thursday, May 31, 1973, and met with Dr. Rifat the next day. The team informed Dr. Rifat and Dr. Williams of the letter agreement between LTD and SCICON and then began discussions about the management contract. Dr. Rifat totally rejected the draft of a preliminary agreement that McCullough had prepared, since this proposed draft was apparently quite different from what Dr. Rifat had in mind.

Initially, the HCA team had thought the compensation for performing any contract would be a cost-plus arrangement, a management fee in addition to reimbursement for all expenses, but representatives of SCICON had suggested to the HCA team that a proposal for a lump-sum contract be presented instead. However, Dr. Rifat was opposed to a lump-sum contract,[10] so the HCA team reverted to the original idea

---

[9]The agreement states a date of "June 31, 1973." The parties have agreed the correct date is May 31, 1973, and we have so found.

[10]Apparently, there had been a tremendous cost overrun on the construction of the King Faisal Hospital, from an estimate of 3 million pounds to over 20 million pounds, and Dr. Rifat did not want to present any large lump-sum figures to the Saudi Arabian Government at that particular time.

of a contract for a management fee, plus costs. Dr. Rifat also objected to other items that were in the preliminary draft prepared by McCullough. For example, the draft proposal did not include the responsibility of recruiting physicians for the King Faisal Hospital, but Dr. Rifat wanted recruitment of physicians included as part of any management contract. The McCullough draft contemplated paying transportation costs to Saudi Arabia and including these costs as reimbursable expenses, but Dr. Rifat said the Saudi Arabian airlines would fly hospital employees to Saudi Arabia.

The result of these discussions in Geneva was a more focused view of the type of proposal Dr. Rifat contemplated. He wanted a proposal by which total management services would be provided for the KFSH. Payment would be a management fee which would include any subcontractor fees. The initial proposal was to cover approximately 18 months from about September 1, 1973, through December 30, 1974, and an additional proposal was to be made to cover a 5-year period beyond December 31, 1974.

In Geneva, the HCA team also met with David Futcher of SCICON who agreed to bring the SCICON proposal to Nashville on June 20, 1973. By that date, the HCA team expected to have a draft proposal for Dr. Rifat. It was tentatively agreed that Futcher and a representative of Hospital Corp. of America would deliver the proposal to Dr. Rifat and Dr. Williams. At the meeting in Geneva, Dr. Williams had stressed that the proposal for Dr. Rifat's consideration should be a complete one, with supporting documentation and emphasizing Hospital Corp. of America's reputation and ability to manage hospitals.

The HCA team returned to Nashville and began drafting a formal proposal for the King Faisal Hospital management contract. In this regard HCA's board of directors resolved on June 5, 1973:

RESOLVED, That in negotiations and agreements for management services to King Faisal Specialist Hospital, Riyadh, Kingdom of Saudi Arabia, the following persons shall have the authority to act in behalf of HOSPITAL CORPORATION OF AMERICA, LTD.:

John C. Neff
Thomas F. Frist, Jr.
Robert P. Brueck

C. George Mercy
Thomas W. Todd,

and such persons, or any of them, be, and they hereby are, authorized to enter into agreements and other documents containing such terms as they shall deem appropriate in furtherance of this project, their execution of any such agreements or documents being conclusive evidence of their approval thereof, and be it further

RESOLVED, That the foregoing persons, or any one of them, be, and they hereby are, authorized in behalf of HOSPITAL CORPORATION OF AMERI-CA, LTD. to take such other action as they may deem appropriate to give effect to the foregoing resolution and to cause HOSPITAL CORPORATION OF AMERICA, LTD. to enter upon the management of King Faisal Specialist Hospital and its related complex pursuant to such agreements.

A group of hospital administrators, accountants, and other HCA personnel was assembled under the direction of Todd to prepare the formal proposal on behalf of LTD. In June of 1973, David Futcher and Alan Perkins, representing SCICON, came to Nashville and reviewed drafts of the contract proposal. Several more proposals were drafted and on July 9, 1973, Todd, Frist, Mercy, and McCullough went to Geneva again and presented to Dr. Rifat a formal proposal for LTD to manage the King Faisal Hospital. During the next 8 days, the parties negotiated several revisions to the original proposal, requiring several redraftings and retypings. Neff was contacted twice during these sessions. At the end of these sessions, McCullough, Todd, and Frist believed they had agreed on a tentative contract, but no contract to manage the King Faisal Hospital was executed during this trip.

During these Geneva meetings, an agreement was executed between LTD and Assem Establishment, a Liechtenstein firm. The agreement provided that Assem would furnish "advisory, consultancy and liaison services" to LTD in Saudi Arabia or elsewhere outside the United States for a fee of 10 percent of the fees paid to LTD under the KFSH management contract. This agreement is dated July 19, 1973, and recites that LTD had "entered contemporaneously" into the contract to manage the KFSH. In fact, the management contract between LTD and the Royal Cabinet of the Kingdom of Saudi Arabia was not executed until August 26, 1973. The 10-percent fee to be paid

to Assem was then included in the proposed contract to manage the KFSH, but was not separately stated.[11]

---

[11]On Oct. 3, 1973, LTD issued a check payable to the order of Assem Establishment in the amount of $37,500. The contractual arrangement with Assem later resulted in trouble for petitioner. On Oct. 26, 1978, the Securities and Exchange Commission (SEC) filed an action against petitioner in the U.S. District Court for the District of Columbia. The complaint alleged various violations of sec. 17(a) of the Securities Act of 1933 (15 U.S.C. 77q(a) (1976)) and secs. 10(b), 13(a), and 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b), 78m(a), and 78n(a) (1976)). The complaint alleged that Assem did not render any consulting or other services, but was merely a conduit for payments to persons of power and influence in Saudi Arabia. See note 5. The complaint further alleged that from 1973 through 1977, petitioner filed with the SEC and disseminated to investors annual reports, registration statements, prospectuses, and proxy statements containing false statements of material fact in regard to the payments to Assem. On the same day, petitioner filed a Consent and Undertaking without admitting or denying any of the allegations in the complaint. A final judgment of permanent injunction was entered enjoining petitioner from violating the anti-fraud provisions of the Securities Act of 1933 and the reporting and proxy provisions of the Securities Exchange Act of 1934. In addition to consenting to the injunction, petitioner's audit committee undertook a review of the question of "direct or indirect payments, if any, to agents, employees or officials of foreign and domestic commercial customers during the period January 1, 1973 through September 30, 1978." The HCA audit committee review made findings concerning Assem Establishment. The report stated that the technical adviser to the KFSH advised petitioner of the necessity of having an agent representing its interests in Saudi Arabia. An internal memorandum prepared by Frist dated May 11, 1973, showed that he was aware that "high-up persons" close to the King would expect a 10-percent fee based on the operating cost of the KFSH. This memorandum also stated that "many people in the middle class through maneuvering behind the scenes and kickbacks" were developing stronger financial positions in Saudi Arabia and that one means of channeling funds back to the Royal Family was to set up corporations outside Saudi Arabia, which took commissions on contracts which were signed. Frist expected that the commission would be 10 percent of the total cost. Several other memoranda indicated that it was necessary to have these agents. These memoranda did not identify the beneficiaries of the Assem payments.

During the investigation, the HCA audit committee interviewed Dr. Williams, the technical adviser to the supervisor of the KFSH during 1970–75. In previous interviews, he had told officials of petitioner that he neither received any of the Assem fees nor knew anyone who received the fees. This time he stated that he had received a percentage of the funds paid to Assem. He explained that salaries paid to civil servants in Saudi Arabia were customarily lower than the salaries of employees of the contractors working for the hospital and that one of the purposes of Assem was to serve as a vehicle to supplement those low government salaries. He maintained that with his background and experience, he normally would have earned much more than the Saudis could pay him under their salary scale, even though he was paid at the same level as an assistant minister. Thus, his salary supplement was a means by which the KFSH could obtain his services and not violate the Government pay scale. According to Dr. Williams, he assisted in the establishment of Assem pursuant to the authority of the hospital project supervisor, who, in turn, was directed to establish the firm by a person of power and influence in Saudi Arabia. He maintained that the payments to Assem did not constitute bribes and were not used for any corrupt purpose. Each contractor with the hospital was purportedly advised at the outset of negotiations that it should include an extra 10 percent in its contract price and that it should not retain any agents other than Assem. Accordingly, because the rules were purportedly the same for all prospective contracts, no favoritism was shown to any particular contractor. The attorney representing Assem was also interviewed. The HCA audit committee report stated that the attorney suggested that Assem performed a number of services for HCA, especially in the

On July 17, 1973, LTD changed its name from Hospital Corp. of the Middle East, Ltd., to Hospital Corp. of America, Ltd. This name change was made at the suggestion of Dr. Rifat because the Saudi Arabian officials "wanted a flavor that would not be Middle East. They weren't particularly enamored with their own ability to deliver medical services and didn't want it sort of associated that way. They wanted an American flavor."

Todd made another trip to Geneva to review a further draft proposal with Dr. Rifat. Modifications to the proposal were made at this time. Dr. Rifat and Todd continued to correspond and revise the contract proposal. In all these negotiations, Todd represented LTD.

## Terms of the Management Contract

In late August 1973, Todd and Neff traveled to Saudi Arabia, and on August 26, 1973, in Jidda, Saudi Arabia, the management contract was executed by Neff as president of LTD and Dr. Rifat on behalf of the Royal Cabinet of the Kingdom of Saudi Arabia.

As required by the KFSH management contract, HCA executed a written guarantee of LTD's performance. The KFSH management contract included the following terms:

THIS AGREEMENT made and entered into this 26th day of August, 1973 by and between the Royal Cabinet of the Kingdom of Saudi Arabia, represented by the Private Office of His Majesty King Faisal Bin Abdul Aziz (referred to hereinafter as the "Owner") and Hospital Corporation of America, Ltd., a company duly established under the laws of the Cayman Islands, whose registered office is situated at Barclays Bank Building, George Town [sic], Grand Cayman Islands (referred to hereinafter as [LTD]);

WITNESSETH:

WHEREAS, Owner is constructing the King Faisal Specialist Hospital in Riyadh, Kingdom of Saudi Arabia and related housing and other facilities

---

area of immigration and customs. The attorney estimated that 50 percent of the fees received by Assem were used to supplement the salaries of employees who had some responsibility for the hospital, but certain of these funds may have been used to make "facilitating payments" to customs or immigration officials. The HCA audit committee concluded that petitioner's officials "acted in good faith and with the intent to promote the best interests of the Company. The Company and its officials were justified in believing that they were not acting unlawfully."

No payments were made to Assem after October 1977. From 1973 through 1977, a total of $4,288,630 was paid to Assem.

(referred to hereinafter as "Hospital"), the Hospital containing 245 beds, with completion of construction scheduled for December, 1974; and

WHEREAS, [LTD] is a wholly-owned subsidiary of Hospital Corporation of America, a corporation organized and existing under the laws of the State of Tennessee, U.S.A. * * * , which operates 51 hospitals in the U.S.A. and which has the expertise and experience reflected in the documents attached hereto and collectively referred to as Annex A, with capability to staff and assume management of operations of the Hospital; and

WHEREAS, [LTD] has entered, or will enter into contracts with parties which are contractors with Owner providing, respectively, the computer communication network, laboratory and nuclear medicine systems, and the equipment and supplies for the Hospital, whereby such parties will provide continuing services to [LTD] and the Hospital.

WHEREAS, the parties hereto wish to establish the terms and conditions of their relationship.

Now, THEREFORE, it is agreed by and between the parties hereto as set forth herein, that [LTD] shall act for Owner as follows:

## I. SCOPE OF AGREEMENT

1.1 [LTD] will, on the effective date of this Agreement, assume the overall responsibility of recruiting the technical, administrative and other staff which will be required to open and operate the Hospital and, to the extent specified by Owner, will recruit the medical staff. [LTD] will also coordinate the managerial aspects of the Hospital with the work being done by others in completing the construction and equipping of the Hospital. * * * Upon the commissioning of the Hospital, [LTD] will assume complete management responsibility for operations of the Hospital, as described hereafter in this Agreement. Throughout the term of this Agreement, [LTD] will continue to keep Owner advised of developments and innovations in delivery of health care and hospital management of which it may become apprised.

1.2 [LTD] will immediately commence recruitment activities of personnel to be employed at the Hospital. * * * All such employment contracts will be between Owner and the employee, but may be executed for Owner by [LTD] as agent. * * * All expatriate personnel recruited must be acceptable to Owner which acceptability shall be evidenced by issuance of an entrance visa.

(a) Owner and [LTD] shall agree upon the number and composition of the medical staff, after which [LTD] shall recruit candidates for such position. * * * Owner shall bear the costs of physicians' travel, other expenses in accordance with the provisions of the respective employment contracts, remuneration and related expenses. [LTD] will make available to the medical staff, from time to time, as a part of an ongoing medical education program, the full facilities of the hospitals in the United States owned and operated by [petitioner]. Members of the medical staffs of such hospitals will from time to time, at the Owner's request, conduct specialized educational programs for members of the medical staff of the Hospital in [petitioner's]

hospitals or other facilities in the United States. It is agreed that Owner will be responsible for the travel and living expenses incurred by members of the medical staff in connection with their participation in such medical and education program for such period of time as may be decided by Owner from time to time.

(b) [LTD] will recruit and employ administrative, nursing, technical, maintenance and all other personnel with full authority to initially set and subsequently adjust their salaries and other remuneration, with Owner's approval to supervise such employees, and in its sole judgment, to terminate the employment of any such personnel. All travel expenses in accordance with the provisions of the respective employment contracts of personnel employed by [LTD] will be paid by Owner, including such expenses of replacement of personnel employed from time to time. [LTD] will also make available to all personnel the full facilities of the hospitals in the United States owned and operated by [petitioner] for specialized continuing education programs at times and on schedules as may be mutually agreeable with [LTD] and Owner. As in the case of the medical staff, Owner will be responsible for the travel and living expenses incurred by such personnel in connection with their attendance at educational programs for a period of time to be decided by Owner, from time to time.

(c) [LTD] will provide a management team of not less than four professional persons to supervise the operation of the Hospital consisting of at least an Executive Director, Association Director, Controller and Director of Nursing Services. The members of this management. team will be employees of [LTD] and their salaries will be paid by [LTD].

\*     \*     \*     \*     \*     \*     \*

1.3 When the Hospital is commissioned, [LTD] will assume complete management responsibility for all operational matters, patient care, clinical research activities related to patient care, maintenance of all buildings, power services, engineering systems, equipment and grounds, providing of supplies to the extent reflected on Schedule A, in-service training of personnel, long-range planning, and such other matters as may from time to time be delegated by Owner or its representatives. In addition, [LTD] will cooperate and where appropriate, coordinate with members of the medical staff to maximize quality patient care, facility utilization and physician-patient-employee relationships. It is understood that Owner may, at some time hereafter, utilize the Hospital together with such additional facilities, equipment and supplies as may be appropriate, to conduct fundamental research which is not contemplated by this Agreement and the expenses of which are not included in the contract price. Should Owner make such determination, [LTD] will advise and consult with Owner as to such research and provide estimates and budgets as to capital expenditures and operational costs and administer such program to the extent Owner may delegate authority.

1.4 It is recognized that availability of housing facilities is essential in order to attract and retain personnel from without Saudi Arabia. [LTD] will assume responsibility for operation, maintenance and supervision of the housing unit and related facilities on the Hospital premises. Owner will bear

all expenses of furnishing such facilities. Where housing facilities on-site are not allocated to expatriate personnel, Owner agrees to pay a housing allowance for such personnel employed at the Hospital in accordance with regulations in effect from time to time in the Kingdom of Saudi Arabia. * * * Owner will provide the procedures whereby such personnel may conveniently obtain necessary entrance and exit visas and documents relating to importation and exportation of personal effects.

1.5 [LTD] has entered, or will enter into, contracts with Scientific Control Systems, Ltd. ("SCICON") and American Hospital Supply Universal Corporation ("AHSUC") securing the continuing services of such parties in the operation of the Hospital, in form acceptable to Owner. Such contracts will contain provisions to the effect that if [LTD] defaults in its performance thereunder, or if this Agreement is terminated for any reason, Owner will be substituted in the place and stead of [LTD] and will continue such contracts with SCICON and AHSUC. All the above provisions shall be applicable to any other sub-contractors which [LTD] may enter into which shall be acceptable to Owner as to form and content.

1.6 It is acknowledged that the ultimate authority for the operation of the Hospital is Owner. The officers and employees of [LTD], including specifically the Executive Director of the Hospital, will on a continual basis, consult with and work in a cooperative manner with Owner and its delegates. It is further acknowledged that it is essential that [LTD] have access to policy and decision-making bodies in order to carry out its responsibilities under this Agreement.

1.7 Owner agrees that it will make available to all expatriate personnel employed at the Hospital and their immediate families resident in Saudi Arabia all medical and dental facilities and services provided by the Hospital at no cost to such personnel.

## II. RECRUITMENT POLICIES

[LTD] will, to the extent consistent with its responsibilities under this Agreement, give preference to citizens of Saudi Arabia in employment and will train such persons with the long-range view of developing their expertise in the technical and administrative management positions of various hospital departments. [LTD] will make available to such personnel the extensive film library and educational aid materials utilized in [petitioner's] hospitals in the United States. However, it is recognized and agreed that initially [LTD] may find it necessary to employ personnel for management and supervisory functions from outside Saudi Arabia.

## III. TERM

The term of this Agreement shall commence as of the date first above written and shall extend through August 31, 1980.

## IV. CONTRACT PRICE

4.1 The contract price and schedule of payments is set forth on Schedule A hereto, marked "Contract Price and Schedule of Payments" and signed by

the parties hereto, which schedule is incorporated by reference herein. It is agreed that such contract price is subject to adjustment commensurate with any enlargement of the total Hospital facilities.

4.2 It is understood and agreed that the contract price is based upon the complete operational management of the Hospital by [LTD] and makes provision for payment by it of expenses of delivery of patient care, maintenance of all buildings, power services, animal house for clinical support, transportation services, including helicopter pad, engineering systems, equipment and grounds on the basis of the design scope of the physical construction of the Hospital at the signing date of this contract and the degree of sophistication of patient care expected to be provided, but not including payment of employees remuneration. All such non-employee expenses will be paid by [LTD] to the extent of the contract price. However, it is further understood that the nature of patient care is highly dependent upon the state of medical technology existing at any given time. As advancements in technology are achieved, the Hospital will be operated so as to take advantage of and receive the benefits of such advancements, and restrictions on patient care will not be imposed due to increased costs which may exceed the contract price, it being the policy of the Owner to provide that quality of patient care which medical technology permits. Therefore, the contract price is divided into two categories of expenses. The amounts shown on such Schedule under items referred to as Fixed Charges for each of the fiscal periods include only those items of pre-determinable management and operating expenses which are directly related to operation of the Hospital and maintenance of the physical facilities (on the basis of the present design, size and equipment complement) of the Hospital. As to the amounts shown on such Schedule under items referred to as Variable Charges, [LTD and petitioner], based upon their experience in budget estimating gained through operating 51 hospitals in the United States, consider these amounts their present best estimates of expenses expected to be incurred in the providing of health care services to patients in the Hospital and other costs related to the operation of the Hospital in the form conceived and as it will be completed. It is recognized that the Variable Charges are also subject to variation depending upon the activities conducted in the Hospital, such as medical research, and the extent of patient care to be provided, which may include the effect on expenses of such factors as occupancy, patient categories, (e.g., open heart surgery or obstetrical care), average length of stay, number of clinic and outpatient visits, and others. Therefore, consistent with the policy of Owner as to operation of the Hospital, the scope of [LTD's] responsibilities and the necessarily estimated nature of the amounts shown on the Schedule, it is agreed that if it should become necessary for the delivery of patient care that the expenses of [LTD] for any fiscal period exceed the amounts shown on Schedule A as Variable Charges, [LTD] will submit to Owner financial, accounting and other data in form mutually agreeable showing actual expenditures for the period involved in excess of the estimated amounts shown as Variable Charges on Schedule A. Such submissions as may be necessary will be made no more frequently than quarterly. Upon such submission and agreement therewith by Owner, the Schedule will be amended accordingly, retrospectively as to

expenses previously incurred (for which [LTD] shall then be reimbursed) and prospectively to include such excess costs in Variable Charges if same are of a recurring nature.

4.3 It is understood and agreed that until August 31, 1974, [LTD] and its sub-contractors shall pay all payroll and other labor expenses which they incur. Owner agrees to pay the salaries and allowable expenses of all physicians directly.

4.4 Effective as of September 1, 1974, personnel who shall have been recruited and employed at the Hospital, shall be paid by Owner, except SCICON and AHSUC employees and the [LTD] management team. All operational, supply, maintenance, and other expenses of operating Hospital, to the extent of the contract amount shown on the Schedule, shall be paid by [LTD]. Owner will bear the expenses of all salaries and agreed upon benefits included in the remuneration arrangements of all employees at the Hospital. [LTD] agrees to administer the payment of all such payroll and other expenses utilizing Owner's funds which shall be deposited by Owner in a bank or other depository from time to time. Owner and [LTD] will agree upon the procedures to be established to assure that [LTD] will have available the necessary funds to timely pay such salaries and benefits expenses, it being agreed that prompt payment to employees is essential for the efficient operation of the Hospital.

4.5 The contract price is based upon the understanding that no corporation or equivalent taxes are payable by [LTD] but should any such taxes be or become payable, appropriate adjustments to the contract price shall be made.

## V. CURRENCY AND PLACE OF PAYMENT

Payment of all amounts due to [LTD] under this Agreement is to be made in U.S. Dollars and deposited to the account of [LTD] at such depository as [LTD] may from time to time designate in writing.

## VI. BANK GUARANTEE

[LTD] shall procure to Owner a letter of guarantee issued by an internationally recognized bank in Owner's favor by which such bank warrants irrevocably that all advance payments, to the extent unearned, made to [LTD] pursuant to the provisions of Schedule A hereto shall be reimbursed in the event of the termination of this Agreement.

## VII. LANGUAGE

[LTD] agrees that it will, within 90 days of the date hereof, deliver to Owner a translation in the Arabic language of this Agreement, including Schedule A. Notwithstanding such translation, it is agreed by Owner and [LTD] that the English language version of this Agreement and Schedule A shall be controlling for purposes of construction of meaning and all other purposes.

## VIII. PERFORMANCE

In the event of totally unforeseen circumstances which would require [LTD] to be unable to continue to perform under this Agreement and it so advises Owner, nevertheless [LTD] will continue to operate the Hospital for a period of six months after such notice, during which time payment of the management fee other than direct costs of operating the Hospital will be withheld until final withdrawal by [LTD] on terms satisfactory to Owner.

## IX. NOTICES

Any written notice or communication mailed or delivered by either party to the other shall be to the following addresses:

If to Owner:   King Faisal Specialist Hospital
                Royal Cabinet
                Post Office Box 2727
                Riyadh, Saudi Arabia
If to [LTD]:   Hospital Corporation of America, Ltd.
                Post Office Box 550
                Nashville, Tennessee, U.S.A. 37202

Since the King Faisal Hospital was not completed when the management contract was executed, a year of operational build-up, from September 1, 1973, through September 1, 1974, was provided in the contract. This year was divided into three periods with a schedule requiring payment for each period to be made in advance. The first period was an orientation period during which LTD was to become familiar with the hospital, its equipment contracts, and the warranties of suppliers. Staffing plans, remuneration programs, employee contracts, and classifications were to be developed during this period. Payment for this period, which ran from September 1, 1973, through December 31, 1973, was $375,000 and was due on September 1, 1973. The second period was scheduled from December 31, 1973, through April 30, 1974. Payment for this period was $1,500,000 and was due on December 31, 1973. The responsibilities of LTD during this time were to establish recruitment materials and sources and to begin the application of business management techniques to the KFSH technology. The third period ran from April 30 through August 31, 1974. During this period, LTD was to recruit employees and medical staff, develop operational systems and manuals, and establish the permanent KFSH management team. Payment for this period was $1,875,000, and was due on May 1, 1974.

Since payments for the year of operational build-up were due before LTD had performed any services, the management contract required LTD to obtain a letter of guarantee from a recognized bank to protect the Royal Cabinet of Saudi Arabia from any losses in the event LTD failed to meet its contractual obligations. The letter of guarantee was obtained by LTD from the First National City Bank of Riyadh, Saudi Arabia. The original guarantee was for $375,000 which was automatically increased by $1,500,000 on December 31, 1973, and by $1,875,000 on May 1, 1974, to correspond to the advance payments to be made by the Royal Cabinet to LTD. In the event of default by LTD or termination of the contract, the bank was to reimburse the Royal Cabinet for any advance payments that had been made to LTD that had not yet been earned.

After the year of operational build-up, the management contract provided a schedule of contract prices for years beginning September 1, 1975, and ending August 31, 1980. The contract price was to be adjusted to offset inflationary factors. The basis for computing the inflationary factor was agreed to be the consumer price index compiled by the U.S. Department of Labor, Bureau of Statistics, Hospital Services Sub Group, for the 6 years prior to imposition of price control regulations in the United States. This schedule provided, however, that "Hospital Corporation of America, because of its acknowledged efficiency in hospital operations, is prepared to accept, for the purpose of this contract, a lower inflationary factor than the general average in the United States." It was therefore agreed that the guaranteed inflationary factor would be 68.29 percent of the average annual increase for 1966 through 1971 as reported by the U.S. Department of Labor.

For the second year of build-up and opening of the King Faisal Hospital (Sept. 1, 1974, to Sept. 1, 1975), the contract provided payment for two separate categories of expenses. Fixed charges or Schedule A items included "only those items of pre-determinable management and operating expenses which are directly related to operation of the Hospital and maintenance of the physical facilities * * * of the Hospital."[12]

---

[12] For the period between Sept. 1, 1974, through Sept. 1, 1975, the lump sum for fixed charges was $5,691,000. The services included recruitment and initial orientation of

Variable charges or Schedule B items were for those expenses and supplies directly related to patient care. The items in this schedule were estimates based upon petitioner's experience in budget estimating gained through operating some 51 hospitals in the United States. The management contract provided that, if these variable expenses exceeded the amounts estimated, the KFSH would reimburse LTD and the schedule for these "B" items would be amended. The first full year of operation of the KFSH was to begin September 1, 1975, 2 years after the management contract went into effect. The total contract price for that year was agreed in the contract to be a present day value of $11,790,000.

A schedule attached to the management contract explained the methodology used to compute the present day values of the operational costs of the KFSH. The schedule referred to petitioner's operation of 51 hospitals in the United States and petitioner's use of "a detailed computerized operational budget planning system" which resulted in forecasts of yearly operational costs within a 1-percent tolerance.[13] In estimating costs for the KFSH, LTD also used the 1973 records from Los Robles Hospital, a 223 bed acute-care hospital that was the most sophisticated facility in petitioner's system. Since the King Faisal Hospital was even more sophisticated than the Los Robles Hospital, the basic operational costs of Los Robles were increased in the management contract estimates.

Another attachment to the management contract was a document entitled "Hospital Corporation of America—Pioneering in the Business of Managing Hospitals." This document stated: "Hospital Corporation of America is the world's largest and most respected hospital management company, and the recognized leader in a rapidly growing and important

---

employees and medical staff, pre-operational testing of all facilities and equipment, implementation of operational systems, opening of the KFSH, initial operational testing and implementations, reception of patients, and takeover of complete operational responsibility of the hospital.

[13] That schedule to the management contract further stated that petitioner—

"uses this same computerized system to monitor, on a monthly basis, actual operational costs, as compared to budget, for each hospital. To accomplish these matters, the company [HCA] has over 75 financial management and analysis managers and approximately 30 such managers are Certified Public Accountants in the United States. HCA is recognized in the United States as a company that is well managed financially, and operates more beds under one financial management system than any other organization in the United States, and to our knowledge, the world."

new industry." The document traced petitioner's history and development and expanded on petitioner's expertise and experience in great detail. It also included a description of petitioner's goals and philosophies and concluded as follows:

The Company has built and opened 21 new hospitals to date, and will open 3 more during the balance of 1973. The total building program including those facilities currently under construction, amounts to more than $200 million.

In addition to its basic hospital business, Hospital Corporation owns a supply and warehousing subsidiary which handles large scale purchasing for its hospitals and supplies other customers as well; owns a number of doctors office buildings and other real estate adjacent to its hospitals, and is studying the development of a professional subsidiary which would operate laboratories, X-Ray services and pharmacies outside the hospitals.

Heavy emphasis is being given by management during 1973 to further development of management contracts, to operating hospitals for other owners, and to promising expansion into foreign countries.

Hospital Corporation will continue to pioneer in the ever-changing health care business, diversifying, expanding, developing new systems and new methods of delivering high quality care at the most economical cost.

Two other documents titled "Scope of the Proposed Pre-Operational Phase" and "Phase Two: Operational Stage" were also attached to the management agreement. The first document stated that LTD would utilize "the extensive experience of Hospital Corporation of America which has constructed, equipped and opened 20 hospitals, comprising over 3,000 beds. In this task, Hospital Corporation of America recruited personnel and medical staff for those facilities." The document set forth in detail the efforts which would be made to prepare the King Faisal Hospital for its opening, including developing a staffing plan, performing the required recruiting, assisting in completing construction of the hospital, planning and coordinating the actual moves of employees into Saudi Arabia, and then designing orientation classes for the new employees with respect to both living in Saudi Arabia and working at the KFSH, and planning opening ceremonies.

The second document concerned LTD's responsibilities once the King Faisal Hospital had opened. Recruitment of personnel would be an ongoing function. Other responsibilities included maintaining payroll and invoice systems, supervising maintenance and service contracts at the hospital, and developing a preventive maintenance system, performing in-service education programs to upgrade the patient skills of employees,

providing for continuing education of the medical staff using the resources of petitioner and the "massive variety of experience and expertise represented in the collective medical staffs" of petitioner's hospitals.

On December 2, 1974, another agreement between LTD and the Royal Cabinet of the Kingdom of Saudi Arabia was made and was titled "Addendum No. 1 to the August 26, 1973 agreement." This agreement provided that LTD would obtain professional services to carry out a landscape development program for the KFSH.[14]

On June 29, 1980, a first amendment to the KFSH management contract was made to extend the contract for one additional year ending August 31, 1981.

### Petitioner's Financial Summary of the Contract

In connection with petitioner's preparation for the trial of this case, a financial summary of the KFSH management contract was prepared from LTD's books and records by C. Terry Deaton, petitioner's assistant vice president, taxation. That unaudited financial summary reported that from September 1, 1973, through August 31, 1980, LTD received gross management fees of $49,281,061 and incurred total operating expenses of $31,465,071, resulting in a profit of $17,815,990. That unaudited financial summary is as follows on page 551. The Court makes no finding as to the accuracy of any of the data contained in the above unaudited financial summary, and as will be indicated below, there is no dispute as to the net profit of LTD for 1973, the only year before the Court.

### Valuation of the Contract: Expert Opinions

Both petitioner and respondent produced expert testimony as to the value of the KFSH management contract as of September 1, 1973. Respondent's expert was James H. Cox, who had been employed by the Internal Revenue Service as a valuation engineer for 11 years and who had previously

---

[14] The landscaping program consisted of design, planting, irrigation, earthwork, mulching, and construction of stone embankments. LTD contracted with Guy S. Greene & Associates to prepare drawings described in a report written by the University of Arizona titled "A Landscape Design Program for the KFSH." LTD agreed to pay the University of Arizona College of Agriculture as a consultant to implement this program.

KING FAISAL SPECIALIST HOSPITAL CONTRACT FINANCIAL SUMMARY

| | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | Aug. 31, 1980 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Management fees received | $1,874,984 | $5,741,999 | $4,043,000 | $6,856,700 | $8,015,864 | $8,841,105 | $8,908,708 | $4,998,701 | $49,281,061 |
| Intercompany expenses incurred: | | | | | | | | | |
| HCA (parent) and U.S. affiliates | | | | | | | | | |
| Technical assistance | -- | 281,931 | 899,082 | 411,547 | 394,286 | 295,232 | 254,616 | 169,896 | 2,706,590 |
| Finder's fee | 150,000 | 76,160 | 175,468. | 168,570 | 174,738 | 181,464 | 188,796 | 162,646 | 1,277,842 |
| Recruiting | -- | 273,100 | 286,435 | 513,358 | 682,000 | 882,980 | 948,418 | 530,925 | 4,117,217 |
| Other | 46,535 | | | | | | | | 46,535 |
| HCI, Ltd., and foreign affiliates | | | | | | | | | |
| Recruiting | -- | 454,000 | 689,629 | 680,216 | 882,455 | 627,330 | 848,803 | 122,239 | 4,304,672 |
| Other expenses incurred: | | | | | | | | | |
| Joe Dini | | 100,000 | 50,000 | 50,000 | 50,000 | | | | 250,000 |
| Assem | 37,500 | 724,200 | 1,018,900 | 1,184,369 | 1,323,661 | | | | 4,288,630 |
| SCICON | 50,000 | 304,683 | 391,900 | 810,296 | 1,068,245 | 1,211,636 | 1,311,262 | 880,572 | 6,028,594 |
| Other | 15,743 | 521,989 | 1,118,696 | 1,088,298 | 1,545,655 | 1,571,302 | 1,292,018 | 1,291,291 | 8,444,992 |
| Total operating expenses | 299,778 | 2,736,063 | 4,630,110 | 4,906,654 | 6,121,040 | 4,769,944 | 4,843,913 | 3,157,569 | 31,465,071 |
| Balance | 1,575,206 | 3,005,936 | (587,110) | 1,950,046 | 1,894,824 | 4,071,161 | 4,064,795 | 1,841,132 | 17,815,990 |

testified as an expert witness in proceedings before this Court. His experience in valuation included appraisals of residential property, land signs, buildings, stocks, bonds, shopping centers, motels, works of art, and bird skeletons. He had never valued a hospital management contract or any other personal service contract.

Cox made his valuation report at the request of Harold L. Rhodes, an internal revenue agent, who specialized in international tax. The valuation report, dated June 4, 1975, stated the value of the KFSH management contract as $34,985,626. The only information Cox had available when he made that appraisal was a copy of the management contract and the expenses for 1973. This dollar value, which was used by respondent in his statutory notice, was based on a net profit from the contract of $45,935,471. Later, for use at the trial of this case, Cox also valued the contract based on a total net profit of $20 million and of $17,815,990, each received in seven equal payments. Using these assumptions, Cox thus determined that the contract as of September 1, 1973, was worth $15,397,968, and $13,718,812, respectively.[15]

Cox applied the same method to arrive at all three of the values. He considered the management contract as similar to an annuity or to a lease on real property. He viewed the contract as a steady income stream the present value of which could be determined. Valuing this income stream required three steps: (1) Selection of the risk rate; (2) projection of the net income stream; and (3) computation of the present worth of the income stream by application of standard interest tables. In selecting the risk rate, Cox considered two factors, the ability of the Saudi Arabian Government to pay and the probability that it would pay. Cox had no doubt as to the Saudi Arabian Government's ability to pay, based on its lack of national debt and its vast oil reserves. In determining the probability that Saudi Arabia would pay, Cox relied upon the political stability of Saudi Arabia, its close ties to the United States, and its concern for its nationals. Cox thought that while there was some risk of Saudi Arabia not paying the

---

[15]The $20 million figure was selected arbitrarily. The $17,815,990 was taken from the unaudited financial summary of the KFSH contract for years 1973 through Aug. 31, 1980, which was prepared by C. Terry Deaton.

contract, that risk was very low. Since the Saudi Arabian ability to pay was very high, Cox felt that any risk of political instability that might affect the probability of payment was thus offset. Cox compared Saudi Arabia with the United States, concluding that Saudi Arabia's financial condition was more stable and healthy than that of the United States, but that the U.S. political situation was more stable than that in Saudi Arabia. Cox thought that the two factors canceled each other out so he considered the risk rate to be comparable to a U.S. Government 5-year bond which, as of September 1, 1973, carried an interest rate of 7.01 percent. Cox used a risk rate of 7 percent to value the income stream from the KFSH management contract. Applying the 7-percent risk rate, he determined the value of the KFSH based on three different streams of income. Cox did not consider any comparable market prices for management contracts. He merely determined the present value in 1973 of the projected income streams as described above.

Petitioner's expert was Joseph C. Hutts, Jr., who had received a master's degree from the University of Chicago in business administration, with a major in hospital administration. Hutts had been a hospital administrator for 10 years, first at the University of Wisconsin Hospitals, and then at St. Lukes Hospital of Kansas City. Hutts had also worked for Hospital Affiliates International, a hospital management company, from 1973–76. During this time, he had responsibility as a regional director for management contracts. Later, Hutts had operational responsibility for a hospital being built on Guam and managed by Hospital Affiliates International. Early on, Hospital Affiliates International had concentrated on management contracts rather than on its own hospitals as HCA had initially done. In early 1977, Hutts began working for HCA as a vice president of operations and was responsible for all of HCA's management contracts. HCA, in late 1976, had made another major commitment to expand its hospital management business as opposed to its HCA-owned hospitals. After about 8 months, Hutts was promoted to president of HSP, Inc., and directed this subsidiary in working with management contracts. HSP, Inc., subsequently changed its name to HCA Management Co.

By the time of the trial of this case, Hutts had personally analyzed, reviewed, or worked with hundreds of hospital management contracts. He had also arranged the purchase of a hospital management contract for HCA Management Co. Hutts testified that, generally, there were tremendous risks in hospital management contracts. He testified also that a well-negotiated management contract that had a reasonable profit built into it could be sold for only between 3-to-4 percent of the gross fees for the contract. The purchase price of the management contract he bought for HCA Management Co. was 3.8 percent of the gross receipts for that contract.

Hutts disagreed with the method of valuation used by Cox. Cox had valued the management contract as if it were an assured income stream. Hutts viewed the management contract as merely an opportunity to make a profit or a loss. According to Hutts, the sale of a management contract merely adds to the expenses of the contract and dilutes the profits from it. In his opinion, no one would buy a management contract for merely the present value of what he could earn from it but would only pay a fraction of that.

Hutts disagreed with Cox's method of valuing the contract as an annuity or lease because of several uncertainties. He viewed the King Faisal Hospital project as a new venture of a type that had never before been attempted by a U.S. management company. He also was of the opinion that there were uncertainties with respect to expenses that had been projected. If the projected expenses were incorrect, he felt that the net income stream would also be incorrect. Hutts anticipated problems in performing a personal service contract for people of a different culture. Hutts viewed the political and religious instability in the Middle East as presenting another potential for problems and uncertainty. If the contract were to be performed in the United States, Hutts would have valued it at $1,700,000, but he thought that the risks associated with the project in Saudi Arabia were so out of proportion to risks associated with a project in the United States, that the contract did not have any market value.

### Performing the Contract

(a) SCICON

After the King Faisal Hospital management contract was executed on August 26, 1973, Neff and Todd traveled to

London, where on August 30, 1973, Neff as President of LTD executed an agreement with SCICON in accordance with their earlier letter agreement of May 31, 1973. SCICON, as a subcontractor of LTD, agreed to design and handle a payroll system for the KFSH, to help LTD select staff, and to maintain and operate the computer equipment and programs. SCICON also agreed that the staff it maintained at the KFSH would be under the direction of an on-site manager who would act upon instructions from LTD. The term of the contract was from September 1, 1973, to August 1980, and the total contract price for SCICON's services was $6,098,614.[16]

In accordance with their agreement, SCICON provided LTD a letter of guarantee, dated October 9, 1973, from the Midland Bank Limited in London, which provided that the Overseas Branch of Midland Bank Limited agreed to pay to LTD an amount up to $50,000 in the event the agreement between SCICON and LTD were terminated and SCICON had received advance payments from LTD which had not yet been earned.

After the contract with SCICON was executed, Neff and Todd returned to the United States. Todd was then appointed vice president of HCI One and vice president of LTD, effective September 1, 1973, and was assigned responsibility for fulfilling the management contract for the KFSH.[17] Todd also retained his position as vice president of petitioner.

(b) Executive Director's Responsibilities

One of the first tasks under the management contract that Todd accomplished on behalf of LTD was selection of the executive director of the King Faisal Hospital. This position was one of at least four key hospital staff positions that the contract required LTD to fill. These four key employees were

---

[16]SCICON had contracted with the Royal Cabinet to supply, deliver, and install the medical information, laboratory, and nuclear medicine systems in the KFSH. The agreement between LTD and SCICON served in part to coordinate their respective agreements with the Royal Cabinet, and in fact the agreement between SCICON and LTD was required by the KFSH management contract between LTD and the Royal Cabinet of the Kingdom of Saudi Arabia.

[17]Todd was officially elected as an officer of HCI One and LTD on Oct. 24, 1973. Todd had been a director of HCI One and LTD since July 6, 1973.

to be employees of LTD, not of the hospital. On September 14, 1973, Jack F. Frayer was advised that he had been selected as Executive Director of KFSH. He was at that time the administrator of Coliseum Park Hospital in Macon, Ga., one of the hospitals petitioner had built and operated through a domestic subsidiary. Since Frayer had been its administrator from the time the Macon hospital was under construction and through its successful opening, Neff and Todd thought that his management style and experience would be particularly well suited to the KFSH project. Moreover, Frayer was considered to be one of petitioner's outstanding administrators.

An appointment letter to Frayer confirmed discussions regarding calendar, compensation, and timing. It was anticipated that Frayer would assume his new position on December 1, 1973, and spend the first few months in either Nashville or London, with trips to Saudi Arabia. By June 1974, Frayer was expected to have moved to Riyadh, Saudi Arabia.[18] Frayer was actually transferred to the LTD payroll as of November 1, 1973. He was the only non-officer employee of LTD during 1973.[19]

During the last 4 months of 1973, Todd and Frayer began performing the tasks required in period I of the KFSH management contract. During this time, they also began familiarizing themselves with Saudi Arabian culture. Frayer worked on a staffing pattern for the King Faisal Hospital that called for 994 employees. In preparing the staffing plan, Frayer received assistance from and utilized the services of employees at the Coliseum Park Hospital. He also obtained

---

[18]In April 1974, Frayer resigned his position as executive director of the KFSH because he did not think he was getting a "team effort" from the HCA organization. He then returned to Macon, Ga., but no longer as an employee of HCA or any of its affiliates. In October 1974, Dr. Rifat invited Frayer to return to Saudi Arabia for a visit. He then began working on the KFSH project as an employee of the Royal Cabinet of Saudi Arabia. In March 1975, he once again became employed by LTD as executive director of the KFSH and at the time of the trial he was still in that position. Frayer received a substantial increase in salary upon resuming employment with LTD. During the time that Frayer was not working for LTD, Ron Larsen was appointed executive director. Larsen had been employed by HSP, Inc., as the administrator of the Holy Family Hospital in Spokane, Wash. HSP, Inc., one of petitioner's subsidiaries, operated this hospital under a management contract.

[19]From 1974 through 1980, LTD had only a few employees. In 1974, 1976, 1977, 1979, and 1980, there were 10 non-officer employees. In 1975 and 1978, there were 11 and 8, respectively. On Form 2032 (Contract Coverage under Title II of the Social Security Act as Amended) dated Mar. 6, 1975, LTD estimated that it had 5 employees.

advice from Coliseum Park employees concerning equipment and supplies for the KFSH.

Frayer also began acquainting himself with the relationships between the KFSH and the other contractors and suppliers. In October 1973, Todd, Frayer, and consultants from some of petitioner's domestic subsidiaries met with representatives of SCICON in London. The consultants from petitioner's subsidiaries were Dorothy Cavendish, director of medical record services at Coliseum Park Hospital; Marie Oscar, assistant administrator of Plantation General Hospital, Plantation, Fla.; Nick Carbone, controller of Plantation General Hospital; and Wanda Whitten, director of dietetics at Redmond Park Hospital in Rome, Ga. The purpose of the meetings in London was to discuss the computer systems that SCICON was to install at the KFSH and to make certain the systems were practical and functional to meet the hospital's various needs. LTD paid each of these individuals from petitioner's affiliates a consulting fee of $25 a day. Carbone and Oscar were paid for 7 days for a total of $175 each. Whitten was paid $150 for 6 days. In addition, LTD paid the expenses of these consultants and also paid the respective subsidiary hospital an amount equal to the salary of its employees for the days the employees spent consulting for LTD. In October 1973, Frayer also met with representatives from a foreign subsidiary of American Hospital Supply to give approval to certain equipment that that corporation had contracted to install at the KFSH.

From November 7 through November 21, 1973, Todd and Frayer were in Saudi Arabia to continue their orientation. This was Frayer's first trip to the King Faisal Hospital. Todd and Frayer learned that the opening of the hospital would be delayed past its scheduled opening date and that some of the people who worked on the project were of the opinion that the hospital would never be completed. Construction on the hospital was proceeding slowly at that time. The architects for the project had been changed several times, and there were problems in installing the sophisticated equipment in the hospital. For example, concrete block walls that had already been constructed had to be channeled out with air hammers to install oxygen and electric lines for the medical equipment. On November 14, 1973, representatives of the KFSH, LTD,

Hospital Design Partnership (the architect), SCICON, and American Hospital Supply Universal Corp. (the major supplier of medical technology, furnishings, and hospital fittings) met. As a result of this meeting, a memorandum of agreement was signed. That agreement scheduled progress on the KFSH project that contemplated that patients could be admitted by January 1, 1975.

After 1973, Frayer encountered several other problems in preparing for the opening and operation of the King Faisal Hospital. Housing in Riyadh was not adequate for those employees who were to be brought to Saudi Arabia. In this respect, the situation in Saudi Arabia was quite different from that concerning petitioner's domestic hospitals. In the domestic hospitals, petitioner did not need to provide housing or recreational facilities for the employees of the hospital or the physicians who used the hospital. However, a great number of the employees of the KFSH were to come from outside of Saudi Arabia, and the hospital construction plans included provisions of housing for them within a total living compound. LTD was responsible for providing all of the housing needs such as air conditioning, beds, silverware, and even irons. The hospital was designed to be part of a totally self-contained community which generated its own power and had its own security system and water supply. Frayer had to hire engineering personnel for the power station and to provide security for both the hospital and the compound.

Another problem Frayer encountered in 1974 was the payroll system. It was anticipated that SCICON would develop a sophisticated computerized payroll system. One of the problems stemmed from the fact that Saudi Arabian law required payment in cash. Moreover, different accounting records were required. One of petitioner's employees, Ed Rake, provided much assistance to Frayer in designing the accounting and payroll system.

On September 26, 1974, LTD deposited 20,000 Saudi Arabian riyals to establish a bank account for the KFSH at the First National City Bank in Riyadh. This account was for operating expenses other than payroll transactions. LTD expected reimbursement from the Royal Cabinet for these funds. Also in September 1974, a payroll bank account for the KFSH was established through a deposit of LTD's funds in the

amount of 60,000 Saudi Arabian riyals. LTD requested reimbursement of these funds by letter dated October 8, 1974. It was anticipated that 90,000 riyals would be necessary to meet the October 1974 KFSH payroll. On October 21, 1974, LTD received 150,000 Saudi Arabian riyals from the Royal Cabinet of the Kingdom of Saudi Arabia to reimburse LTD for these funds.

The King Faisal Hospital opened in April of 1975 and admitted its first patients in June of 1975. The first surgery took place in September of 1975. The hospital opened gradually. After the hospital opened, Frayer found that operating the King Faisal Hospital was different from operating a hospital in the United States. For example, the Saudi Arabian culture mandated certain different procedures, particularly in matters concerning separation of men and women. Moreover, there were problems getting equipment and supplies into Saudi Arabia and then problems of maintaining the equipment in Saudi Arabia. In the United States, Frayer found that equipment could be repaired in 24 hours while in Saudi Arabia, it might take several weeks.

The day-to-day operations of the King Faisal Hospital were administered by Frayer without much direct assistance from petitioner. With experience gained in Saudi Arabia, Frayer later modified the HCA operations manuals or developed his own manuals and procedures to meet the particular needs of the KFSH, just as he had done with the Macon hospital. If a problem arose that required special or technical assistance from petitioner, such assistance was arranged through Telex or telephone. On occasion, Frayer borrowed some of petitioner's personnel on a temporary basis. Some of petitioner's employees came to the King Faisal Hospital to assist Frayer in materials management or accounting. For example, Ed Rake was borrowed for about a year to assist in designing an accounting system for the KFSH. On other occasions, petitioner "loaned" Frayer assistant administrators and nurses. Sometimes these borrowed specialists were only minimally helpful to Frayer because the King Faisal Hospital was different from hospitals in the United States, but on other occasions their assistance was quite valuable to Frayer and the hospital.

### (c) Recruiting for KFSH

One of the major tasks LTD faced under the management contract was the responsibility of recruiting the technical, administrative, and other staff required to open and operate the King Faisal Hospital. The contract required LTD to employ a management team of not less than four people. The other members of the staff were to be employed by the KFSH but recruited by LTD.[20] Frayer's initial staffing plan called for 994 employees. By the time of the trial, there were between 2,200 and 2,500 people employed at the hospital, representing some 40 to 42 different nationalities.

Petitioner did not have any established procedures or experience for recruiting internationally, which to some extent was different from recruiting for hospitals in the United States. However, petitioner had extensive expertise and experience recruiting for hospitals throughout the United States, and LTD had no prior experience or track record in recruiting either in the United States or abroad. Since the King Faisal Hospital was intended to be a showcase of the Middle East, the standards for selection of employees were quite high. Policies had to be established to attract top technicians, doctors, and nurses. It was also necessary to determine the requirements of Saudi Arabian regulations concerning the employment of non-Saudi Arabians, although there was some leeway in this respect since the KFSH reported directly to the Royal Cabinet instead of the Ministry of Health or the Ministry of Labor. In addition to employment qualifications, it was necessary to learn about the lifestyle of prospective employees. This inquiry included information as to religion, marriages, personalities, children, sexual promiscuity or any other habits that might be considered inappropriate by the Saudi Arabian Government and culture. LTD's recruiting function involved establishing selection criteria for employees, procedures for recruitment of personnel, classification and compensation of employees, and the design of employment contracts.

---

[20]Until Aug. 31, 1974, LTD and its subcontractors had the responsibility of paying all payroll and other labor expenses, with the exception of physicians who were paid directly by the KFSH. After Sept. 1, 1974, all personnel employed at the hospital except for SCICON, AHSUC, and LTD's management team were paid by the KFSH.

Ronald C. Marston, an employee of Vanderbilt University Medical Center, was hired to recruit personnel for the KFSH. Marston had experience in recruiting paramedical personnel with a particular emphasis on nurse recruiting. Todd had discussions with Marston and it was agreed that Marston would begin working for Hospital Corp. International on January 1, 1974. To assist in recruiting, Todd, Frayer, and Marston used the services of Middle East Industrial Relations Counselors, Inc. (MEIRC), a consulting organization located in Beirut. MEIRC was an independent consulting firm specializing in the field of manpower management and organization in the Middle East. Its services included providing general information about doing business in the Middle East and providing expertise in recruitment of personnel and in personnel policies and employment contracts. MEIRC had expertise in dealing with Saudi Arabia. This organization was employed by LTD to perform wage and compensation surveys, to assist in designing and preparing personnel policies, employment contracts, compensation programs, and employee relations manuals, and to provide information on subjects unique to Saudi Arabian law. It was not until late 1974, however, that a regular employment contract was developed and used by LTD.

Initially, it was envisioned that all recruiting would be done in London, so in late December 1973, Marston moved to London. His initial responsibility was to establish a recruiting office in London and then begin world-wide recruiting for the KFSH.

Petitioner's London counsel then advised petitioner to set up a second chain of Cayman Islands subsidiaries to avoid taxes on LTD's income under the "trapping" concept of United Kingdom tax laws. Petitioner wanted to use the name "Hospital Corporation International" for the London recruiting function but also did not want the recruiting corporation to be the parent of LTD. Thus, on January 24, 1974, the name of Hospital Corp. International, Ltd. (HCI One), was changed to Hospital Development Co., Ltd. Two new tiers of subsidiaries were then formed in the Cayman Islands. Hospital Management Services, Ltd., was organized as a direct subsidiary of petitioner. Hospital Corp. International (HCI Two) was formed as a direct subsidiary of Hospital Management Services, Ltd.

As of January 31, 1974, the organization of petitioner's Cayman Islands subsidiaries was as shown on page 563.

The operational unit of HCI Two for the London recruiting function was thus established in London in early 1974. Later in 1974, HCI Two established additional operational units for recruitment in Cairo, Beirut, and Riyadh. The representatives of the King Faisal Hospital then decided they wanted more American doctors and other employees. This required increased recruiting efforts in the United States, so Marston was transferred from London to Nashville to open a U.S. recruiting office for the KFSH. In Nashville, Marston was employed by petitioner's International Division, which was not a separate corporation but a part of the Tennessee parent corporation.

The recruiting efforts accelerated. A brochure was published and distributed describing employment opportunities for certain health care people at the KFSH. The recruiting brochure described the hospital, the "international community within the hospital compound," and the "exciting life" in Saudi Arabia. Expressions of interest concerning employment opportunities at the KFSH were to be directed to either the KFSH Director of International Recruitment of HCI Two in London, or the KFSH Director of International Recruitment of Hospital Corp. of America International in Nashville. In August of 1975, a recruiting agreement between LTD and petitioner was signed which purported to confirm "the previous oral contract under which the parties hereto have performed since January 1, 1974." The term of the agreement was to last until August 31, 1975. LTD agreed to pay petitioner $1,100 for each employee recruited and employed by the KFSH. LTD also agreed to pay petitioner $250,000 for its services performed in establishing and staffing a recruiting office in Nashville. LTD also contracted with HCI Two to pay $450,000 for the London and Beirut recruiting offices which HCI Two had established and staffed. In addition to this fee, LTD agreed to pay HCI Two $800 for each person recruited and employed at the KFSH.

*Intercompany Contracts*

In 1973, there were no intercompany contracts, written or oral, between petitioner and LTD. In August of 1974, certain actions were initiated which culminated in the execution of a series of intercompany contracts in August of 1975. In August

HOSPITAL CORP. OF AMERICA
FOREIGN SUBSIDIARIES AS OF 1/31/74

HOSPITAL CORP. OF AMERICA

Hospital Management Services, Ltd.
  Formed on Jan. 17, 1974
  Registered on Jan. 21, 1974

Hospital Development Co., Ltd.
(HCI One)
  Formed on May 28, 1973, and
  Registered on May 29, 1973, as
    Hospital Corp. International, Ltd.
  Change of name to
    Hospital Development Co., Ltd.
  Registered on Jan. 24, 1974

Hospital Corp. International, Ltd.
(HCI Two)
  Formed on Jan. 17, 1974
  Registered on Jan. 28, 1974

Hospital Corp. of America, Ltd.
(LTD)
  Formed on May 28, 1973, and
  Registered on May 29, 1973, as
    Hospital Corp. of the Middle East,
    Ltd.
  Change of name to
    Hospital Corp. and America, Ltd.
  Registered on July 17, 1973

of 1974, James F. Hughes was transferred into petitioner's international operations as a vice president over finance and administration.[21] Hughes' responsibility was to organize and structure accounting procedures and records for petitioner's international subsidiaries. At the time Hughes began his review of the records, the 1973 accounting records of LTD had been closed, so he did not pay attention to items in that year other than certain ending balances.

After his review of the records, Hughes determined that intercompany charges should be made for services rendered among HCI Two, petitioner, and LTD. These services included recruiting, technical assistance, and services performed in obtaining the KFSH management contract.

By letter dated September 16, 1974, Hughes asked Robert McCullough to develop "ruff [sic] drafts of the following contracts which are needed to further document the arms' length relationship" between petitioner, LTD, and HCI Two. Three contracts were contemplated. The first was to be between LTD and HCI Two, whereby HCI Two agreed to recruit employees for the KFSH and to give advice on local customs and practices applicable to personnel matters. The second contract was to be between petitioner and LTD, whereby petitioner was to recruit employees for the KFSH, to give advice on local customs and practices applicable to U.S. personnel matters, to render technical and supervisory assistance, and to render accounting assistance. The third contract was to be between HCI Two and petitioner, whereby petitioner agreed to render technical, supervisory, and accounting services to HCI Two. In Hughes' September 16, 1974, letter, no reference was made with respect to the fees for these services. In this regard, Hughes stated:

You will note that I made no references to the fees to be paid relative to the services being rendered between the above companies. I anticipate that the various budgets will be completed within the next two weeks so that I can insert the amount which would be reasonable. Incidentally, it is my recommendation that the above contracts be for a relative [sic] short period of time or subject to simple cancellation provisions. I believe that this

---

[21]Hughes had been employed as a C.P.A. by Ernst & Ernst from 1963-69. From 1972 through 1974, he had been one of petitioner's vice presidents with the responsibility for maintaining and enforcing the Economic Stabilization Act as it related to petitioner.

flexibility is desirable because of the state of flux in which the respective companies currently operate.

Authorization for and execution of various intercompany contracts took place in August of 1975. On August 14, 1975, an annual meeting of the board of directors of LTD was held in Georgetown, Grand Cayman Island. All of the LTD directors were present at the meeting,[22] at which officers were elected and resolutions were passed as follows:

(1) RESOLVED, That Hospital Corporation of America, Ltd. enter into a contract with Hospital Corporation of America to pay Hospital Corporation of America a finder's fee based upon fees collected by Hospital Corporation of America, Ltd. under a contract resulting from a certain favorable opportunity presented to Hospital Corporation of America, Ltd. by Hospital Corporation of America.

(2) RESOLVED, That Hospital Corporation of America, Ltd. enter into a contract with Hospital Corporation of America, for a fee, providing that Hospital Corporation of America will do certain purchasing, make certain payments, make certain investments and supply certain experts from time to time for Hospital Corporation of America, Ltd.

(3) FURTHER RESOLVED, That Hospital Corporation of America, Ltd. sign a one year extension to a contract with Hospital Corporation of America whereby Hospital Corporation of America supplies certain technical services to Hospital Corporation of America, Ltd.

(4) RESOLVED, That Hospital Corporation of America, Ltd. enter into a contract with Hospital Corporation of America, for a fee, whereby Hospital Corporation of America undertakes to recruit staff and other matters for Hospital Corporation of America, Ltd.

(5) FURTHER RESOLVED, That Hospital Corporation of America, Ltd. sign a one year extension to a contract with Hospital Corporation of America, with revisions, whereby Hospital Corporation of America undertakes to recruit staff and other matters for Hospital Corporation of America, Ltd.

(6) RESOLVED, That Hospital Corporation of America, Ltd. enter into a contract with Hospital Corporation International, Ltd., for a fee, whereby Hospital Corporation International, Ltd. undertakes to recruit staff and other matters for Hospital Corporation of America, Ltd.

(7) FURTHER RESOLVED, That Hospital Corporation of America, Ltd., sign a one year extension to a contract with Hospital Corporation International, Ltd., with revisions, whereby Hospital Corporation International, Ltd. undertakes to recruit staff and other matters for Hospital Corporation of America, Ltd.

---

[22]On that same date, an annual stockholders' meeting was held in Georgetown, Grand Cayman Island. Frist, Jr., was present to represent petitioner as "the sole stockholder of the corporation." Directors of LTD were elected at this meeting.

Pursuant to those resolutions by the LTD board of directors, a series of intercompany contracts were executed. Two basically identical copies of a contract corresponding to resolution 1 requiring LTD to pay petitioner a finder's fee were introduced at the trial. Both finder's fee contracts were executed by C. George Mercy for LTD and John Neff for petitioner. One contract was executed as follows:

IN WITNESS WHEREOF the parties hereto have executed this Agreement in George Town [sic], Grand Cayman Island, C.I., B.W.I. this ____day of _____, 1975, for the purpose of documenting the previous oral contract under which the parties hereto have performed *since August 15, 1973.* [Emphasis added.]

The other finder's fee contract has the blanks filled in longhand to read "14th day of August, 1975," and states it is to document the previous oral contract that had been performed since *January 1, 1974.* Another difference between the two finder's fee contracts is that the undated contract provided that LTD had no right to use the name of "Hospital Corporation of America" in any form other than as part of its corporate name. The dated contract did not contain this limiting provision.

In other respects, the two finder's fee contracts were identical. LTD agreed to pay petitioner an annual finder's fee based on petitioner's acting as agent or finder with respect to the negotiation and execution of the KFSH management contract and in guaranteeing LTD's obligations under that contract. The finder's fee was based on the fees that LTD received under its contract to manage the KFSH. LTD was obligated to make the payments only as it received payment of fees under the KFSH management contract. The annual fee provided for payments at the rate of 5 percent for the first million dollars, 4 percent for the second million, 3 percent of the third million, 2 percent of the fourth million, and 1 percent of all fees in excess of 4 million dollars. The term of this finder's fee contract was to be co-extensive with LTD's contract to manage the KFSH. The record does not establish that there was any agreement between HCA and LTD in regard to a finder's fee at any time in 1973. However, the record clearly establishes that HCA rendered substantial services in 1973 in the negotiation and execution of the King Faisal Hospital management contract on behalf of LTD.

The contract corresponding to the second resolution was also executed in the Cayman Islands in August 1975 by Neff on behalf of petitioner, and by Mercy on behalf of LTD. This contract provided that petitioner would purchase equipment, inventory, supplies, and other goods, arrange for their shipment to the KFSH, and pay for them with LTD funds, provide technical or specialized expertise on a temporary basis, and invest funds of LTD. For these services, LTD agreed to pay petitioner a monthly fee of $20,000 for services performed in the United States and an amount equal to 3 times the daily salary of petitioner's employees, plus round trip air fare, for services performed outside the continental United States. This contract stated that it was effective January 1, 1974, through August 31, 1975. It also stated that it was executed to document a contract the parties had performed since January 1, 1974. A document corresponding to resolution three and purporting to extend this contract until August 31, 1976, was executed by Mercy for LTD, and by Neff for petitioner in August 1975 in the Cayman Islands.

Two copies of the recruiting contract corresponding to resolution four were produced at the trial. The sole difference between the two is that one contract is dated August 14, 1975, while the other is undated. The copies were executed by Mercy for LTD, and by Neff for petitioner, and stated an effective period from January 1, 1974, through August 31, 1975. Under this contract for recruiting in the United States, LTD agreed to pay petitioner $250,000 for establishing and staffing a recruitment office in Nashville and a fee of $1,100 for each employee hired at the KFSH. A letter agreement extending this recruiting contract to August 31, 1976, was dated August 14, 1975. The fee of $1,100 was increased to $1,200 for each employee recruited to work at the KFSH. Moreover, the following clause was added to the contract:

Limited agrees to pay to International [sic] [should be petitioner] a fee of $600 in respect of each employee recruited by International who shall extend his employment with King Faisal Specialist Hospital and Research Centre beyond the first year.

A contract between HCI Two and LTD concerning recruiting outside the United States and a letter agreement extending this contract corresponding to resolutions six and seven were also executed in the Cayman Islands on August 14, 1975, again

executed by Mercy for LTD, and by Neff for HCI Two. The basic contract stated it was effective from February 1, 1974, through August 31, 1975, and stated that it had been executed to document the previous oral contract the parties had been performing since February 1, 1974. Under the contract, HCI Two agreed to establish offices in London, England, and Beirut, Lebanon, to recruit employees for the KFSH. LTD agreed to pay $450,000 to establish the offices and a fee of $800 for each recruit employed at the KFSH. The extension to this contract increased the fee from $800 to $1,000 for recruits employed at the KFSH and an additional clause by which LTD agreed to pay HCI Two $500 for each employee who extended his employment beyond the first year.

At this same time, three other contracts were executed between HCI Two and petitioner. HCI Two agreed to pay petitioner a finder's fee for presenting it the opportunity to contract with LTD for the recruitment of personnel for the KFSH. HCI Two agreed to an annual fee based on payments it received under its recruiting contract with LTD. The annual rate was 5 percent for the first million dollars, 4 percent of the next million, 3 percent of the third million dollars, 2 percent of the fourth million dollars, and 1 percent of all fees in excess of four million dollars. The term of this agreement was to be co-extensive with the term of the agreement between HCI Two and LTD. The second contract between petitioner and HCI Two provided that petitioner would invest HCI Two funds, establish and maintain accounting records for HCI Two, and provide specialized or technical expertise on a temporary basis. As compensation for the services, HCI Two agreed to pay petitioner $2,000 per month for all services performed within the United States. For services to be performed outside the United States, the fee was 3 times the daily salary of the employee involved, plus round trip air fare. This contract stated it was to begin February 1, 1974, and extend through August 31, 1975, and could be renewed annually subject to renegotiation of the monthly fee. This contract was extended until August 31, 1976. The contracts between petitioner and HCI Two were executed by Neff for petitioner, and Mercy for HCI Two.

The dated copies of the contracts between petitioner and LTD concerning recruiting, extension of recruiting, and the

payment of the finder's fee, as well as the contracts between LTD and HCI Two concerning recruiting and the extension of this contract, and the contract between petitioner and HCI Two were all supplied to respondent in a single batch in 1978. The undated contracts, which are basically identical to the dated contracts, were allegedly prepared by McCullough in early 1975 in response to the request from Hughes. All of the contracts were executed in the Cayman Islands in August of 1975.

The fees contained in the various intercompany contracts executed in the Cayman Islands in August of 1975 were determined by Hughes, an employee of HCA. There is no evidence in the record to show whether or not those fees are reasonable and reflect the value of the services that would be obtained in an arm's-length transaction between unrelated parties.

At a meeting of the board of directors of LTD held in the Cayman Islands on December 10, 1976, it was resolved that the recruiting contracts between LTD and petitioner and between LTD and HCI Two be extended to December 31, 1977. The contract between LTD and petitioner for the provision of technical assistance was also extended through December 31, 1977, and modified so that LTD would pay petitioner an amount equal to 1 times the salary of former employees of petitioner who were employees of KFSH on a long-term basis when the services were performed for KFSH.

From 1974 to August 1980, as a result of the various intercompany contracts, LTD paid petitioner $2,706,590 for fixed and variable technical assistance, $4,117,216 in recruiting fees, and $1,127,842 as a finder's fee. In addition, LTD paid petitioner $150,000 as reimbursement of the sum petitioner paid to Joe Dini in 1973 as a finder's fee. During the same period of 1974 to 1980, LTD paid HCI Two and other foreign affiliates $4,304,672 for recruiting. The record does not establish whether these payments were reasonable for the services rendered.

Petitioner and its domestic subsidiaries filed a consolidated U.S. Corporation Income Tax Return on Form 1120 for 1974 on September 15, 1975. On Form 2952 (Information Return With Respect to Controlled Foreign Corporations) included in this return, petitioner reported that LTD had paid it $631,191 as

compensation for the rendition of technical, managerial, engineering, construction, scientific, or like services. This sum consisted of $281,931 for technical assistance, $76,160 for the finder's fee, and $273,100 for recruiting. This amount was not included in petitioner's taxable income on this return. On March 17, 1976, petitioner filed Form 1120X, Amended U.S. Corporation Income Tax Return for 1974. This amended return reported an increase of $682,608 in total income and additional deductions in the amount of $549,176. The reason for these changes was stated as "Net income of $133,432 for one of the Divisions of Hospital Corporation of America was inadvertently omitted from the return." The sources of this increased net income were fees recorded by petitioner for services it had performed for LTD and expenses allegedly incurred by petitioner which were associated with those services. The record does not establish the correctness of the figures stated on the amended return for 1974.

## LTD's 1973 Financial Transactions

LTD maintained a bank account with the Cayman Islands branch of the First National City Bank. Bank statements of this account were mailed to Hospital Corp. of America, Ltd., P.O. Box 550, Nashville, Tenn. 37202, U.S.A. In September of 1973, the sum of $374,985.85 was deposited in this account, representing the first advance payment from the Royal Cabinet on the KFSH management contract (after deduction of minor expenses). In 1973, LTD wrote checks on this account to pay the following expenses:[23]

FEES PAID DIRECTLY BY HCA, LTD.—1973

| | | |
|---|---|---|
| 1. | Bank fee for cheque book for First National City Bank, Grand Cayman Branch account | $5.85 |
| 2. | Fee for guarantee paid to First National City Bank, Riyadh, Saudi Arabia | 566.77 |
| 3. | Fee of W. S. Walker & Co., Cayman Island counsel | 285.00 |
| 4. | Consulting fee—Nick Carbone on Plantation General Hospital | 175.00 |
| 5. | Plantation General Hospital—reimbursement of salary expense for days Nick Carbone spent consulting for HCA, Ltd | 570.00 |

---

[23]This schedule was prepared from LTD's books and records by C. Terry Deaton, petitioner's assistant vice president, taxation, in connection with petitioner's preparation for the trial of this case.

| | | |
|---|---|---:|
| 6. | Marie Oscar of Plantation General Hospital—consulting fee ............ | $175.00 |
| 7. | Plantation General Hospital—reimbursement of salary expense for days Marie Oscar spent consulting for HCA, Ltd ..................................................................... | 653.00 |
| 8. | Wanda Whitten of Redmond Park Hospital—consulting fee ............ | 150.00 |
| 9. | Redmond Park Hospital—reimbursement for salary expense of Wanda Whitten for days spent consulting for HCA, Ltd ..................................................................... | 360.00 |
| 10. | Hospital Corp. of America for accounting and financial services rendered ................................................. | 880.00 |
| 11. | Automatic data processing—employee payroll services .................. | 91.95 |
| 12. | SCICON ......................................................................... | 50,000.00 |
| 13. | Assem establishment ....................................................... | 37,500.00 |
| | Total ....................................................................... | 91,412.57 |

Petitioner's books reflected various income/expense items in connection with LTD. In preparation for the trial of this case, the following summary of 1973 adjustments to accounts was prepared by C. Terry Deaton, petitioner's assistant vice president, taxation:

HCA, LTD./HCA INTERCOMPANY ACCOUNTS—1973

| | | |
|---|---|---:|
| 1. | Account payable HCA, Ltd., to HCA established by journal entry in September of 1973 to reimburse expenses paid by HCA in connection with investigation and negotiation of management contract ................................................ | $27,229.47 |
| 2. | Account payable HCA, Ltd., to HCA established by journal entry in September of 1973 to reimburse finder's fee paid by HCA to Joe Dini ......................................................... | 150,000.00 |
| 3. | Account payable HCA, Ltd., to HCA established by journal entry in September of 1973 to reimburse legal fees of W. S. Walker & Co., Cayman Island counsel, for services rendered to HCA, Ltd., paid by HCA ............................................... | 1,028.20 |
| 4. | Account payable HCA, Ltd., to HCA established by journal entry in November of 1973 for travel expenses paid by HCA in connection with King Faisal Specialist Hospital management contract ....................................................................... | 5,126.45 |
| 5. | Account payable HCA, Ltd., to HCA established by journal entry in December of 1973 to pay HCA interest on funds advanced by HCA for the benefit of HCA, Ltd .......................... | 5,593.52 |
| 6. | Account payable HCA, Ltd., to HCA established by journal entry in December of 1973 to reimburse various expenses paid by HCA in connection with the King Faisal Specialist Hospital ......................................................................... | 14,430.44 |
| 7. | Account payable HCA, Ltd., to HCA established by journal entry in December of 1973 to reimburse December salary paid to Jack Frayer, executive director of the King Faisal Specialist Hospital ............................................................. | 2,583.34 |
| 8. | Adjusting journal entry made in December, 1973, to balance HCA, Ltd./HCA intercompany account .................................. | 82.65 |
| 9. | Cash payment made Dec. 27, 1973, by HCA, Ltd., to HCA to reduce intercompany account payable ...................... | (175,000.00) |
| 10. | Balance of account payable HCA, Ltd., to HCA at 12/31/73 ......... | 31,074.07 |

The trial balances for petitioner for the months of September through December 1973 reflected these amounts as "Notes Payable to HCA." Included in the first item listed as $27,229.47 were two payments to Ernst & Ernst totaling $4,824.45. The first in the amount of $2,302.20 was for tax research and planning during May 1973, for Saudi Arabia, United Kingdom, Switzerland, and the Cayman Islands. The second payment of $2,522.25 was for accounting assistance and expenses during June 1973 in the preparation of cost estimates used in negotiating the management contract for KFSH. A large percentage of the first item in this list consists of travel expenses including approximately $12,000 in air fare alone, for the various members of the HCA team who traveled to London, Geneva, and Riyadh in connection with the negotiation and execution of the KFSH management contract, as detailed earlier.

In 1973, LTD received from the Royal Cabinet of the Kingdom of Saudi Arabia pursuant to the KFSH management contract net fees totaling $1,874,984 in two payments, $374,984 in September, and $1,500,000 in December. Deaton's unaudited financial summary for the KFSH contract for 1973 is as follows:

| | |
|---|---:|
| Management fees received | $1,874,984 |
| Intercompany expenses incurred: | |
| HCA (parent) and U.S. affiliates | |
| Technical assistance | 0 |
| Finder's fee | 150,000 |
| Recruiting | 0 |
| Other | 46,535 |
| HCI, Ltd., and foreign affiliates | |
| Recruiting | 0 |
| | |
| Other expenses incurred: | |
| Joe Dini | 0 |
| Assem | 37,500 |
| SCICON | 50,000 |
| Other | 15,743 |
| Total operating expenses | 299,778 |
| Balance | 1,575,206 |

*Tax Advice*

From the beginning of the KFSH project, tax consequences were considered. Dini had recommended that an offshore company be set up because of "its obvious tax advantages." A memorandum dated October 15, 1973, titled the "International Taxation of Foreign Operations" was prepared for petitioner by Gary T. Baker, a member of the tax staff of Ernst & Ernst in Nashville. This memorandum concluded that both HCI One and LTD were controlled foreign corporations as defined by section 957(a). Baker then analyzed whether income earned by these foreign corporations would be taxed currently or whether taxation would be deferred. His opinion was that any income earned by LTD would not be foreign base company services income as defined by section 1.954–4(b)(1), Income Tax Regs. Baker's conclusion was based on his opinion that petitioner's role was solely that of a guarantor and that neither petitioner nor HCI One gave LTD "substantial assistance" in performing services under section 1.954–4(b)(2), Income Tax Regs. In Baker's opinion, the lack of substantial assistance could be established by showing that neither petitioner nor HCI One furnished LTD with a material amount of supervision and direction, financial assistance, or technical know-how. It was also Baker's opinion that LTD did not have the effect of substantially reducing income taxes under section 1.954–1(b), Income Tax Regs. He recognized that "it seems ironical that such a contention could be made for a corporation incorporated under the laws of a 'tax haven' country, but nevertheless, the contention is valid." Baker's argument was based on the quantitative standard contained in section 1.954–1(b)(3)(iii), Income Tax Regs. His analysis of the regulation was that if the tax paid by LTD to the Cayman Islands with respect to the services income earned by it in Saudi Arabia equaled or exceeded 90 percent of the tax that would have been paid to Saudi Arabia (assuming that LTD had been "incorporated in Saudi Arabia"), the organization of LTD in the Cayman Islands would not be considered to have the effect of substantially reducing income taxes. His interpretation of the regulation was that the test of the regulations looked to the relative tax rates of Saudi Arabia and the

Cayman Islands. Baker concluded that since Saudi Arabia imposed no income tax on LTD, the quantitative test of the regulations was passed.[24] No subpart F issue has been raised in this case, and we do not reach the question as to whether Baker's interpretation of section 1.954–1(b)(3)(iii), Income Tax Regs., is correct.

Baker's legal opinion also predicted that it was more likely that respondent would attempt to reallocate income under section 482 than to raise a subpart F issue. In this regard, Baker advised giving constant attention so that all dealings among petitioner, HCI One, and LTD be at arm's length, and warned that the "failure to judiciously comply with that requirement would surely prove to be the greatest potential tax trap facing the international operations."

*1973 Tax Return*

On September 11, 1974, petitioner and its domestic subsidiaries filed a consolidated income tax return (Form 1120) for the year ended December 31, 1973. The return included: (1) Form 2952 (Information Return with Respect to Controlled Foreign Corporations) for Hospital Development Co., Ltd. (formerly Hospital Corp. International, Ltd.), and Hospital Corp. of America, Ltd.; (2) Form 3646 (Income from Controlled Foreign Corporation) for both of these subsidiaries; and (3) Form 4683 (U.S. Information Return on Foreign Bank, Securities, and Other Financial Accounts), listing the bank accounts maintained by each of the subsidiaries at the Cayman Islands branch of the First National City Bank. On an attachment to

---

[24]The original contract price of the KFSH management contract was based upon the understanding that no "corporation or equivalent taxes" were payable by LTD. A letter dated Feb. 19, 1976, to Robert P. Brueck, vice president, Hospital Corp. of America, Ltd., stated "You [sic] company has been exempted from any form of taxation, by the higher authorities of the Kingdom." This exemption was granted "as a result of the direct decree from His Majesty King Faisal Bin Abdulaziz [sic] Al Saoud," regardless of the country in which Hospital Corp. of America, Ltd., was created or organized or from which it was managed or controlled.

Form 3646, petitioner reported that it had "no foreign base company income since in accordance with regulation 1.954–1(b)(3) the organization of the controlled foreign corporation does not have the effect of substantially reducing income taxes." Petitioner reported that it had excluded net income of $718,524.

On November 22, 1974, respondent's agent, Harold L. Rhodes, began participating in the audit of petitioner's 1972 and 1973 tax returns. Rhodes was an internal revenue agent specializing in international tax. During the next 6 months as the examination proceeded, he made several requests for records, some of which were honored and others were not. On July 10, 1975, a preliminary audit finding was issued to petitioner for an informal discussion of the proposed adjustments. The primary foreign income adjustment respondent proposed at that time was to the effect that petitioner had transferred the contract to manage KFSH to its foreign subsidiary in exchange for stock without an advance ruling under section 367. Therefore, the total value of the contract was deemed taxable income to petitioner in 1973. As an alternative adjustment, respondent proposed that the income from the management contract was earned by petitioner and taxable to it under section 61 or allocated to it under section 482.

On July 17, 1975, the conference was held. Petitioner's representatives requested respondent's examining officers to request technical advice from respondent's national office on the foreign income issue. The parties never reached agreement on the facts pertaining to this issue and the request for technical advice was ultimately withdrawn in July 1978.[25]

In May of 1978, petitioner elected to terminate an agreement on Form 872-A, Special Consent Fixing Period of Limitations Upon Assessment of Income Tax. That action precipitated the issuance of the statutory notice of deficiency before a thorough examination and development of the facts had been completed by respondent.

---

[25]Rhodes submitted a first copy of his report and request for technical advice in November 1975. Petitioners responded with their final statement of facts in January 1976. Rhodes submitted supplemental reports on Sept. 23, 1976, Nov. 1, 1976, Aug. 18, 1977, Sept. 27, 1977, Feb. 3, 1978, and Apr. 21, 1978. Petitioner's representative submitted additional statements on Feb. 18, 1977, Feb. 28, 1977, Sept. 26, 1977, Nov. 14, 1977, and Apr. 14, 1978.

## ULTIMATE FINDINGS OF FACT

(1) Hospital Corp. of America, Ltd., is not a sham corporation and is to be recognized for Federal income tax purposes;

(2) The management contract for the King Faisal Hospital was not obtained by petitioner and then transferred to its Cayman Islands subsidiary, Hospital Corp. of America, Ltd., within the terms of section 367; and

(3) Seventy-five (75) percent of the 1973 net income of Hospital Corp. of America, Ltd., is allocable to petitioner under section 482.

## OPINION

Hospital Corp. of America (hereinafter HCA or petitioner) is in the business of owning and/or managing hospitals. During the years before the Court, petitioner generally had a separate domestic subsidiary corporation to operate and manage each hospital it owned and had another domestic subsidiary for all of the hospitals it managed under management contracts with the owners thereof. Until 1973, petitioner's organization operated exclusively in the United States.

In late 1972, after an initial contact by a certain finder, petitioner gave a "hunting license" to that finder to pursue an opportunity for a contract to manage a hospital in Saudi Arabia. In February of 1973, after introductions by that finder, petitioner was invited to send representatives to Saudi Arabia to discuss the possibility of contracting to manage the King Faisal Specialist Hospital (hereinafter KFSH or the King Faisal Hospital), which was then under construction in Riyadh, Saudi Arabia. The KFSH, owned by the Royal Cabinet of the Kingdom of Saudi Arabia, was intended to be equipped with the latest in sophisticated computers and medical equipment and to be a showcase or the "Mayo Clinic" of the Middle East. Petitioner made preliminary investigations as to the potential profit and prestige of contracting to manage the KFSH and decided to pursue the opportunity.

Petitioner decided at the outset that it would not become directly involved in international operations but would organize foreign subsidiaries for any foreign expansion. It therefore organized two corporations in the Cayman Islands. Tax consequences were considered in making the decision to incorporate in the Cayman Islands. These Cayman Islands

corporations were organized as first- and second-tier subsidiaries of petitioner. The first-tier subsidary was Hospital Corp. International, Ltd. (HCI One), and the second-tier subsidiary was Hospital Corp. of the Middle East, Ltd. (LTD). The names of these corporations were later changed to Hospital Development Co., Ltd. (HCI One), and Hospital Corp. of America, Ltd. (LTD). HCI One was formed to be an umbrella corporation for any expansion into foreign countries. LTD was formed specifically to obtain and perform the management contract for the King Faisal Hospital. On August 26, 1973,. LTD and the Royal Cabinet of the Kingdom of Saudi Arabia executed that management contract. Petitioner did not include any of the income earned from the KFSH management contract on its 1973 tax return. This case involves only the adjustments for this foreign income for the year 1973.

In the statutory notice of deficiency, respondent determined that petitioner transferred property to LTD, its foreign subsidiary, without an advance ruling, as required by section 367. Therefore, respondent asserted that the value of the contract, which his expert valued at $34,985,626, was taxable income to petitioner in 1973. Alternatively, respondent determined that the income earned from the management contract in 1973 was taxable to petitioner under section 61 or allocable to petitioner under section 482. Under either of these alternatives, respondent determined that LTD's net income of $1,787,030 was taxable to petitioner in its entirety.[26]

Respondent has since shifted his emphasis. His primary argument now is that LTD is a sham corporation and therefore all income derived from the KFSH management contract in

---

[26]To arrive at the taxable income of $1,787,030, respondent added to the $718,524 net income of LTD as reported on petitioner's Form 2952 the sum of $1,031,006 representing advance payments from Saudi Arabia under the management contract and $37,500 representing respondent's disallowance under sec. 162(c)(1) of a deduction for a payment LTD made to Assem in 1973. In its petition, petitioner did not assign as error these particular adjustments. They are therefore deemed to be conceded by petitioner pursuant to Rule 34(b)(4), Tax Court Rules of Practice and Procedure. See *Jarvis v. Commissioner*, 78 T.C. 646, 658 (1982). Based on the fact that petitioner had not challenged the adjustment of the income of the foreign subsidiary, the Court at the opening of the trial denied respondent's motion for leave to amend the answer to disallow the payment to Assem as an illegal expense. Therefore, if LTD's net income is taxable to petitioner under sec. 61 or allocable to petitioner under sec. 482, the amount is $1,787,030. In other words, the amount of LTD's net income for 1973 is not in dispute. For that reason, the Court declined respondent's invitation to decide the illegal payments issue despite the fact that it is a continuing issue in later years. See notes 5 and 11.

1973 was in fact earned by petitioner and taxable to it under section 61. Alternatively, respondent still argues that the contract was transferred to LTD without an advance ruling required by section 367, so the value of the contract is taxable to petitioner in 1973. As a further alternative and as new matter, respondent argues that stock in LTD was received by petitioner in exchange for petitioner's services in negotiating the contract, and therefore the value of the stock of LTD is taxable to petitioner as ordinary income as compensation for services. Under both of these alternatives, respondent argues that the value of the stock equals the value of the KFSH management contract as of September 1, 1973. Finally, respondent argues that all of the income and expenses of LTD are allocable to petitioner under section 482. Thus, respondent has attacked the validity of LTD's existence, and consequently the income earned by LTD, from several different angles.

## I. SHAM CORPORATION

Respondent's primary position is that LTD is a "sham" corporation that should not be recognized for Federal income tax purposes. Respondent asserts that LTD was "a mere skeleton; a sham corporation that existed in form only for the purpose of obtaining the tax benefits available to a foreign corporation." Respondent argues that the fees earned from the KFSH management contract were produced by petitioner's professional skill, expertise, know-how, reputation, goodwill, experience, business organization, and procedures and are therefore taxable wholly to petitioner under section 61.[27] Respondent maintains that "the formation of LTD is no more than an old-fashioned anticipatory assignment of income in the guise of a modern-day gimmick known as an offshore tax haven." He asserts that the question is the same as that raised in *Lucas v. Earl*, 281 U.S. 111 (1930), one of substance versus

---

[27]Sec. 61 provides in pertinent part:

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

(2) Gross income derived from business;

form, and that in substance the income from the KFSH management contract was earned by petitioner, not LTD.

LTD was properly organized in accordance with the Cayman Islands Companies Law, a fact that respondent does not dispute. It does not follow, however, that LTD will necessarily be recognized for Federal tax purposes. See, e.g., *Noonan v. Commissioner*, 52 T.C. 907, 909 (1969), affd. per curiam 451 F.2d 992 (9th Cir. 1971); *Shaw Construction Co. v. Commissioner*, 35 T.C. 1102, 1104 (1961), affd. 323 F.2d 316 (9th Cir. 1963); *Aldon Homes, Inc. v. Commissioner*, 33 T.C. 582, 597 (1959). Respondent asks us to disregard LTD's existence for tax purposes.

Generally, the corporate entity will be respected except in "exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934). See also *Ross v. Commissioner*, 129 F.2d 310, 313 (5th Cir. 1942); *Noonan v. Com. `:sioner*, supra*, 52 T.C. at 910. The test of whether a corporation will be recognized as a taxable entity was stated by the Supreme Court in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438-439 (1943), as follows:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Fn. refs. omitted.]

These alternative requirements of business purpose or business activity have been restated in a long line of cases in this and other courts.[28] As to the latter requirement, the quantum of business activity may be rather minimal. *Britt v. United States*, 431 F.2d 227, 235 (5th Cir. 1970); *Strong v. Commission-*

---

[28]See *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949); *Jackson v. Commissioner*, 233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955); *Achiro v. Commissioner*, 77 T.C. 881, 901 (1981); *Ross Glove Co. v. Commissioner*, 60 T.C. 569, 588 (1973); *Bass v. Commissioner*, 50 T.C. 595, 600 (1968); *V. H. Monette & Co. v. Commissioner*, 45 T.C. 15, 35 (1965), affd. sub nom. *Monette v. Commissioner*, 374 F.2d 116 (4th Cir. 1967); *Columbian Rope Co. v. Commissioner*, 42 T.C. 800, 813 (1964); *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 618 (1964); *Shaw Construction Co. v. Commissioner*, 35 T.C. 1102, 1114 (1961), affd. 323 F.2d 316 (9th Cir. 1963); *Aldon Homes, Inc. v. Commissioner*, 33 T.C. 582, 597 (1959).

*er*, 66 T.C. 12, 24 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977).

Petitioner has the burden of proving that LTD meets either of these requirements. *Welch v. Helvering*, 290 U.S. 111 (1933); *Bass v. Commissioner*, 50 T.C. 595, 602 (1968); Rule 142(a), Tax Court Rules of Practice and Procedure. Based on the record in this case, we are persuaded that LTD satisfied both of these tests, and we hold that it is to be recognized as a separate corporate entity for Federal tax purposes.

Our inquiry in that regard is essentially factual. Each case turns on its individual facts and circumstances. *Shaw Construction Co. v. Commissioner, supra; Bass v. Commissioner*, 50 T.C. at 602. Respondent has relied primarily on *Aldon Homes, Inc. v. Commissioner, supra*, and *Shaw Construction Co. v. Commissioner, supra*, to support his position.

In *Aldon Homes*, 16 "alphabet corporations" were organized to develop a tract of land for residential purposes. The corporations operated in all respects in unison. None of the corporations had employees of its own. The houses were built on a mass production basis as the construction workers moved from house to house when their particular trade was needed. We held that the alphabet corporations "were not organized for any purpose other than the obtaining of tax benefits; that they did not carry on the business activities which resulted in the profits from the development of Tract 17169, nor any substantial business activities, and consequently did not earn the income in question." 33 T.C. at 597.

*Shaw Construction Co. v. Commissioner, supra*, presented similar facts. There, 88 corporations were used in the acquisition, development, and sale of 13 separate tracts of land. The multiple corporations had no separate offices, no employees, no payroll, and no furniture or equipment. We decided that respondent's position in *Shaw Construction* was even stronger than in *Aldon Homes*. Shaw Construction Co., the company to which the income was taxed, "actually built the homes and performed all of the activities which gave rise to the income, while, in the *Aldon* case, Aldon Homes, Inc., did not do the construction work in its own name and on the surface was relatively inactive during the period involved." 35 T.C. at 1113. We held that the multiple corporations were shams to be

disregarded for tax purposes and that Shaw Construction earned the income and was to be taxed on it. 35 T.C. at 1114.

After careful consideration of all the facts, we are persuaded by a preponderance of the evidence that the facts in issue here are not nearly as extreme as those presented in *Aldon Homes, Inc. v. Commissioner, supra,* or *Shaw Construction Co. v. Commissioner, supra.* Rather, we think the instant case is more akin to *Bush Hog Manufacturing Co. v. Commissioner,* 42 T.C. 713 (1964), and *Nat Harrison Associates, Inc. v. Commissioner,* 42 T.C. 601 (1964).

In *Bush Hog,* the dominant corporation manufactured cutting machines and formed two sales companies to distribute the machines. As the business expanded into new areas, the parent formed new sales companies to handle the distribution and service functions in these areas. We held that was a sound business reason for forming separate corporations and held that the net income from the sales companies was earned by them and not by Bush Hog Manufacturing Co. 42 T.C. at 722-724.

Similarly, in *Nat Harrison Associates, Inc. v. Commissioner, supra,* we found that a decision that Overseas, a Panamanian corporation, would conduct business activities outside the United States and that a domestic corporation would conduct the business activities inside the United States was "a natural division of the business." 42 T.C. at 618.

In the instant case, the pattern was similar to that in *Bush Hog* and *Nat Harrison Associates.* Petitioner had organized domestic subsidiary corporations to operate each of its hospitals in the United States. It also had a separate domestic corporation to handle the non-HCA-owned hospitals operated under management contracts. The formation of LTD to manage the King Faisal Hospital was consistent with this pattern. From the outset, petitioner had planned to pursue any operations in foreign countries through foreign corporations, all of which would be under the umbrella of a foreign corporation. For example, when petitioner was considering whether to build a hospital in Athens, Greece, articles of incorporation were drawn up for a subsidiary corporation to be formed in Greece. HCI One, petitioner's first-tier subsidiary in the Cayman Islands, was created to be the parent corporation of all subsidiary corporations to be formed to manage foreign

hospitals. LTD was specifically formed to obtain and perform the KFSH management contract. As in *Nat Harrison Associates, Inc. v. Commissioner, supra,* we think this can be viewed as a natural division of petitioner's business.

Respondent argues that it was not necessary to form a corporation to either identify profits from the project or assign responsibilities for the operation of the KFSH project. Respondent argues that petitioner could have negotiated and performed the contract for itself through one of its divisions or could have permitted a domestic subsidiary to negotiate and to perform the contract. In essence, respondent's argument is that petitioner could have accomplished its objectives without the necessity of forming a corporation in the Cayman Islands.[29]

It was petitioner's business decision to use subsidiary corporations to operate and manage its own hospitals as part of its general philosophy of decentralized management, local identity, and local authority. The use of a separate corporation for ease in assigning responsibility for the success of the project or for keeping a separate accounting of the profits from the KFSH management contract is a business purpose. *Moline Properties, Inc. v. Commissioner, supra.* We will not second guess petitioner's business decision to form LTD to operate and manage the King Faisal Hospital. See *Bush Hog Manufacturing Co. v. Commissioner,* 42 T.C. at 723.

Respondent has also asserted that the only reason petitioner organized LTD in the Cayman Islands was to avoid U.S. corporate income tax on the fees earned under the KFSH management contract. In his zeal regarding the Cayman

---

[29]Respondent also suggests that a reason for incorporating LTD in the Cayman Islands was to avoid the disallowance of payments to Assem as an illegal deduction under sec. 162(c)(1). This section disallows deductions for payments made directly or indirectly to an official or employee of a foreign Government if the payment is an illegal bribe or kickback or if the payment would be unlawful under the U.S. law if those laws were applicable to the payment or the official or employee. Respondent has suggested that the payments to Assem were within sec. 162(c)(1) and were not deductible. He then suggests that the incorporation of LTD in the Cayman Islands helped to conceal the nature of these payments. In its petition, petitioner assigned as error respondent's determination that all of the income and expense of LTD should be allocated to petitioner under sec. 61 or sec. 482. Petitioner did not assign as error the adjustment concerning the disallowance of the $37,500 payment to Assem in 1973. There is no dispute in this case as to the amount of LTD's net income for 1973, and there is no issue as to any illegal payments. See note 26. Therefore, we will not consider respondent's argument that one of the reasons for incorporating LTD in the Cayman Islands was to disguise the nature of the payments to Assem.

Islands' status as a tax haven, respondent has failed to address the fact that LTD would not have been taxable if it had been organized in Saudi Arabia since King Faisal had exempted this contract from any corporate tax. Petitioner's officers testified that there were several reasons for choosing the Cayman Islands as the jurisdiction for incorporation rather than Saudi Arabia. Among these reasons were the use of the English language, the familiar English principles on which Cayman Islands corporate law is based, the stability of the Government, and the ease of communication and transportation between petitioner's headquarters in the United States and the Cayman Islands.

Petitioner has also admitted that one of the reasons it incorporated LTD in the Cayman Islands was that the Cayman Islands did not impose an income tax on corporations registered under section 179 of the Cayman Islands Companies Law. This in and of itself is not a sufficient reason to disregard the corporate existence of LTD. *Ross Glove Co. v. Commissioner*, 60 T.C. 569, 588 (1973). See also *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. at 618. In *Higgins v. Smith*, 308 U.S. 473, 477 (1940), the Supreme Court recognized that a taxpayer "is free to adopt such organization for his affairs as he may choose." Taxpayers have the right to plan and carry out transactions in such a manner as to minimize the incidence of taxation. *Gregory v. Helvering*, 293 U.S. 465 (1935).

Thus, the fact that petitioner intended to obtain tax advantages by organizing LTD in the Cayman Islands does not in and of itself require a holding that LTD is a "sham" corporation. In *Bass v. Commissioner, supra*, we inferred that the taxpayer organized a Swiss corporation with a view toward reducing taxes. We stated:

The test, however, is not the personal purpose of a taxpayer in creating a corporation. Rather, it is whether that purpose is intended to be accomplished through a corporation carrying out substantive business functions. If the purpose of the corporation is to carry out substantive business functions, or if it in fact engages in substantive business activity, it will not be disregarded for Federal tax purposes. 50 T.C. at 601.

See also *Siegel v. Commissioner*, 45 T.C. 566, 576 (1966). Since petitioner organized LTD to carry out business functions, i.e., for a business purpose, petitioner has satisfied one of the

alternative requirements under *Moline Properties* and the line of cases cited in note 28.

Petitioner has also proved by a preponderance of the evidence that LTD actually carried on some minimal amount of business activity in 1973. LTD possessed the "salient features of corporate organization." *Bass v. Commissioner*, 50 T.C. at 600; *Buckley v. Commissioner*, 22 T.C. 1312, 1325 (1954), affd. per curiam 231 F.2d 204 (2d Cir. 1956). LTD was properly organized under the Companies Law of the Cayman Islands. In 1973, LTD issued stock, elected directors and officers, had regular and special meetings of directors, had meetings of shareholders, maintained bank accounts and invested funds, had at least one non-officer employee, paid some expenses, and, with substantial assistance from petitioner, prepared in 1973 to perform and in subsequent years did perform the KFSH management contract. All of these are indicative of business activity. See *Bass v. Commissioner, supra* at 600.

Moreover, LTD's identity was recognized by entities not controlled by petitioner. In 1973, LTD entered into a contract with SCICON and in later years entered into contracts with MEIRC, the University of Arizona, and Guy S. Greene & Associates. LTD was also recognized by banks, including the Overseas Branch of Midland Bank Limited and First National Bank branches. This fact, too, leads to the conclusion that LTD actually carried on some business in 1973 and should be recognized for tax purposes.[30]

---

[30]In later years, LTD carried on substantial business activities and had significant dealings with petitioner and HCI. In 1975, intercompany contracts were executed to formalize these relationships among petitioner and the foreign subsidiaries. Both petitioner and respondent place great reliance on these contracts to support their respective positions. Petitioner argues that these contracts demonstrate that LTD was an entity independent of petitioner. Respondent argues that these intercompany contracts were an after-the-fact tax planning device and an attempt to document and fragmentize the performance of the KFSH management contract. Since most of these events occurred in years subsequent to 1973, the only year before the Court, we find them of little significance one way or the other. However, since the parties have tried, argued, and briefed these matters at great length, we will briefly address them.

Petitioner asserts that the contracts were executed in early 1975 but were retroactive to the beginning of 1974. These written contracts purportedly were executed to reflect oral agreements under which the corporations had been previously operating. Respondent asserts that these contracts were executed in August 1975, and only after preliminary findings were announced by respondent's examining officer in July 1975. These findings proposed the foreign income adjustment under sec. 367 as well as the proposed alternative that income earned under the KFSH management contract should be taxed to petitioner

In 1973, LTD received management fees of $1,874,984 from the King Faisal Hospital management contract. It incurred some operating expenses and had a substantial profit from operations that year. During 1973, LTD made some cash payments to ·petitioner to reduce an intercompany account. During the last four months of 1973, LTD wrote checks for at least $91,412 to pay expenses. These checks included $50,000 paid to SCICON in accordance with the contract with that company. LTD also made payments to Nick Carbone, Marie Oscar, and Wanda Whitten for consulting fees, payment of their expenses, and payment to the respective HCA hospitals in which they were employed as reimbursement of salary. Respondent argues that these payments to some of the specialists in petitioner's organization and the payment to petitioner to reduce the intercompany account balance are merely "attempts to put some flesh on the bones of LTD." We disagree. These payments are further indications that LTD carried on some modest amount of business in 1973.

Respondent's contention that LTD is a sham is based primarily on his assertion that petitioner could have negotiated and performed the contract itself. The question is not

under sec. 61 or allocated to it under sec. 482. Respondent argues that the Aug. 14, 1975, resolutions of LTD's board of directors and the presence of contracts dated Aug. 14, 1975, corresponding to those resolutions were all made in response to respondent's proposed audit adjustments. Respondent calls our attention to the "confusion in the terms of the various contracts." We note that in the letter written by Hughes to McCullough dated Sept. 16, 1974, there is no suggestion of a contract calling for a finder's fee, yet two copies of such a contract were produced in evidence. One undated copy of this contract stated that it had been executed to document the previous oral contract under which the parties had performed *since Aug. 15, 1973*. The other copy of this contract, dated Aug. 14, 1975, stated that it was executed to document "the previous oral contract under which the parties have performed *since January 1, 1974*." (Emphasis added.) One fact is clear: LTD did not make any payments to petitioner in 1973 under this purported contract. In support of respondent's argument that the contracts were drafted merely to give substance to LTD after the fact, we take note of the fact that in the Sept. 16, 1974, letter which Hughes wrote to McCullough, he instructed the attorney to leave open the fees to be paid in regard to the services being rendered by petitioner, so that after the various budgets had been completed, Hughes could insert the amount which would be reasonable. This statement leads us to the obvious conclusion that no oral contracts were in existence before Sept. 16, 1974, the date of that letter. Otherwise, there would have been no need to leave the terms of these contracts open. While we are of the opinion that there were no contracts until August 1975, the existence of these contracts has very little bearing on the tax issues before us.

Whether there were oral contracts in 1974 or whether the written contracts were executed in early 1975 or August 1975, the year in issue is 1973. In presenting this case, both parties seem to have lost sight of that fact.

whether petitioner could have, but whether it in fact did. We are satisfied that while petitioner's officers and representatives were wearing multiple hats, before the KFSH contract was finally negotiated, these individuals were acting in their capacity as officers and directors of LTD. The fact that these same individuals were also officers and directors of petitioner is not sufficient reason for us to disregard the corporate existence of LTD. In this respect, the facts are similar to those of *Bush Hog Manufacturing Co. v. Commissioner*, 42 T.C. at 719. We are also satisfied that some modest amount of business activity was actually conducted by LTD in 1973 through Todd and Frayer in preparing to perform the KFSH management contract. While petitioner provided substantial supervision and other important assistance, Frayer was an employee of LTD and performed some services for LTD in 1973.

In 1973, the King Faisal Hospital was still under construction and, in fact, did not open to patients until 1975. The KFSH management contract provided certain specific responsibilities for the period beginning September 1 and ending December 31, 1973. These responsibilities included setting up a staffing plan, remuneration programs, employee contracts and classifications, and becoming acquainted with the relationships between the KFSH and other contractors such as SCICON and American Hospital Supply Co. These tasks were performed under the direction of Frayer and Todd.

Since LTD was organized for a business purpose and actually carried on some business activities in 1973, we hold that LTD was not a sham corporation and that it is to be recognized for tax purposes. *Moline Properties, Inc. v. Commissioner, supra; Ross Glove Co. v. Commissioner*, 60 T.C. at 590; *V. H. Monette & Co. v. Commissioner*, 45 T.C. 15, 35 (1965); *Columbian Rope Co. v. Commissioner*, 42 T.C. 800, 813 (1964); *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. at 620; *Bush Hog Manufacturing Co. v. Commissioner, supra*. For the reasons recited above, we have been persuaded by a preponderance of the evidence that LTD is a separate corporate entity to be recognized for tax purposes in 1973. Therefore, we cannot find that all of the income of LTD is taxable to petitioner under section 61, as respondent contends. We are also persuaded, however, that petitioner itself performed substantial

services for LTD for which it was not compensated. We therefore think it appropriate in this case to allocate substantial portions of LTD's 1973 income to petitioner pursuant to section 482.[31] We will further consider this matter and determine below what portion of LTD's income is properly allocable to petitioner.

## II. SECTION 367

Respondent's second argument is that the management contract was negotiated by petitioner and then transferred to LTD without obtaining the advance ruling required by section 367. Section 367 provided in pertinent part:

SEC. 367. FOREIGN CORPORATIONS.

(a) GENERAL RULE.—In determining the extent to which gain shall be recognized in the case of any of the exchanges described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless—

(1) before such exchange, or

(2) in the case of an exchange described in subsection (b), either before or after such exchange,

it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

(d) CONTRIBUTIONS OF CAPITAL TO CONTROLLED CORPORATIONS.—For purposes of this chapter, any transfer of property to a foreign corporation as a contribution to the capital of such corporation by one or more persons who, immediately after the transfer, own (within the meaning of section 318) stock possessing at least 80 percent of the total combined voting power of all

---

[31] In *Rubin v. Commissioner*, 429 F.2d 650, 653 (2d Cir. 1970), revg. and remanding 51 T.C. 251 (1968), the Second Circuit, in discussing the relationship between secs. 61 and 482, stated: "Resort to 'common law' doctrines of taxation and the broad sweep of § 61 may occasionally be useful * * * they have no place where, as here, there is a statutory provision adequate to deal with the problem presented." On remand, we held that sec. 482 applied, 56 T.C. 1155 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). We quoted from *Grenada Industries, Inc. v. Commissioner*, 17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953):

"the general provisions of section 22(a) [now sec. 61] are undoubtedly sufficient to charge the income to the one that actually earned it. But in the case of organizations under common control, the detailed provisions of section 45 of the Code [now sec. 482] explicitly authorize the Commissioner to unscramble any such situation, so that income may be charged to the organization that earned it. Thus, to the extent that section 45 may be applicable, section 22(a) adds nothing to the strength of respondent's position here. * * * [56 T.C. at 1161. Citations omitted.]"

In this case too, we think the preferred analysis is through sec. 482. See also *Keller v. Commissioner*, 77 T.C. 1014, 1034 (1981), on appeal (10th Cir., Apr. 2, 1982).

classes of stock of such corporation entitled to vote shall be treated as an exchange of such property for stock of the foreign corporation equal in value to the fair market value of the property transferred unless, before such transfer, it has been established to the satisfaction of the Secretary or his delegate that such transfer is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

By reason of section 367(d), if petitioner transferred property to LTD, a foreign corporation, the transaction would be treated as an exchange of the property for stock in LTD equal in value to the fair market value of the property transferred, unless an advance ruling was obtained determining that avoidance of Federal income taxes was not one of the principal purposes of the plan pursuant to which the transfer was made. See *Hershey Foods Corp. v. Commissioner*, 76 T.C. 312, 317 (1981). If petitioner did not transfer property to LTD, then section 367 does not apply.

In his statutory notice, respondent identified the property he determined that petitioner had transferred to LTD:

The property transferred was a management service contract between you and the Royal Cabinet of Saudi Arabia, together with other related property, including, but not limited to, name, goodwill, expertise, capabilities, reputation, personnel and budget planning system. The contract was in substance negotiated and executed by you; and it was transferred to Hospital Corporation of America, Ltd., without adequate consideration.

In the statutory notice, respondent valued the contract at $34,985,626 as of September 1, 1973. This value was based on the gross fees to be earned under the contract without adequate consideration of operating expenses. At trial, respondent has argued that the minimum value of the contract is $13,718,812. This value results from the application of the discount rate determined by respondent's expert to the amount of $17,815,990 calculated by petitioner's assistant vice president for taxation, Mr. Deaton, as the total net profit earned on the contract, until August 31, 1980.[32]

Respondent's argument is that since petitioner could have executed the contract itself or designated any of its domestic subsidiaries to execute the contract, its choice of having LTD

---

[32]Since respondent argues that the amount received by petitioner for the management contract is a substitute for profits, he argues that the gain should be characterized as ordinary income. Since we hold that petitioner did not transfer the management contract to LTD, the question of whether the income is capital gain or ordinary income does not arise.

negotiate, execute, and perform the contract is in substance the transfer of property by petitioner to LTD which required an advance ruling. Respondent specifically argues that HSP, Inc., a domestic subsidiary that performed other management contracts, could have been selected by petitioner to perform this contract.

Respondent then asserts that petitioner's "indisputable control" over the execution of the contract requires the conclusion that execution of the contract in the name of LTD was the transfer of the contract to LTD. We have answered respondent's argument in *Crowley v. Commissioner*, 34 T.C. 333, 345 (1960), where we stated: "There is a difference between being in a position to control who shall perform the activities which produce the income and being in a position to control * * * who shall receive income after it is produced, and we think that distinction is basic in this case." Petitioner's control in organizing and designating LTD to negotiate, execute, and perform the KFSH management contract is not the same as control over who shall receive the income after it is earned.

We are satisfied that LTD negotiated and executed the contract and later performed the contract, but with substantial assistance from petitioner. LTD was in existence at the time the serious negotiations for the contract took place. Todd, the overall coordinator in developing the contract proposal, had been a director of LTD since July 6, 1973. The serious negotiations were in large part thus conducted on LTD's behalf by one of its directors.[33] Once the contract had been executed, the primary responsibility for its performance, at least in 1973, was held by Todd and Jack Frayer, the executive director of the KFSH and an employee of LTD.

Petitioner did present LTD with the opportunity to negotiate and perform the King Faisal Hospital management contract. The question then is whether this opportunity is property under sections 351 and 367. Neither section specifically defines property, but for purposes of section 351, "Courts

---

[33]Todd did receive substantial assistance from petitioner in these negotiations, and we have concluded accordingly that petitioner must be compensated for those services. We have also found that LTD received assistance from petitioner in performing the contract and must be compensated for those services as well. We will discuss this later under the sec. 482 heading.

have advocated a generous definition of property." *E. I. Du Pont de Nemours & Co. v. United States*, 200 Ct. Cl. 391, 404–405, 471 F.2d 1211 (1973).[34]

In support of his position, respondent has cited *H. B. Zachry Co. v. Commissioner*, 49 T.C. 73, 80 (1967), which held that a carved out oil payment was property. In that case, respondent argued that the carved out oil payment was not property because it was a "pure income right." We held that the oil payment was property because it had present value and was an interest in land. Respondent has also cited a memorandum opinion of this Court,[35] in which the taxpayer transferred to his controlled corporation an executed contract to purchase property. We held that the executed contract was property for purposes of section 351.

We find both of those cases distinguishable from the facts presented here. In both of those cases, the transferee received a legally enforceable right in specific property—in one case, the carved out oil payment, and in the other, the contractual right to purchase property on favorable terms. Petitioner, in presenting LTD with an opportunity to enter into a contract, did not transfer any legally enforceable contractual or other right to LTD. Instead, in discovering this business opportunity and making it available to LTD, petitioner simply performed a service for which it is entitled to reasonable compensation.[36] We therefore hold that petitioner did not transfer any property to LTD, so a section 367 ruling was not required.[37]

---

[34]See *Stafford v. United States*, 611 F.2d 990, 995 n. 6 (5th Cir. 1980), for a listing of cases discussing what constitutes property under sec. 351.

[35]See *Ungar v. Commissioner*, T.C. Memo. 1963–159.

[36]See discussion at pp. 591–592 *infra*.

[37]In light of this conclusion, we find it unnecessary to determine a dollar value for the KFSH management contract as of 1973. We are of the opinion, however, that neither the value determined by respondent's expert nor the zero value asserted by petitioner's expert is correct. Hutts, petitioner's expert, said the contract did not have any fair market value because of the risks associated with the project. Respondent's expert, Cox, determined the minimum value of the contract as $13,713,812. This calculation, however, merely represented the present worth of an income stream over a 7-year period using a risk rate of 7 percent. That rate was the equivalent interest rate earned by a U.S. Government 5-year bond on Sept. 1, 1973. We do not think this accurately assessed the risks involved. While petitioner had been very successful in the United States, it had not undertaken operations in countries outside of the United States. Moreover, there were potential risks resulting from political instability in the Middle East. We think Cox's projection would have to be adjusted to reflect a greater risk. On the other hand, petitioner objected that no one would buy a contract for the present value of just what one would earn over the contract term, suggesting that one

## III. STOCK FOR SERVICES

Respondent's third argument is that petitioner received stock in LTD for services rendered in negotiating the contract and for services to be rendered in the performance of the contract. Respondent argues that the value of the stock petitioner received as compensation for services is equal to the entire value of the management contract, less LTD's paid-in capital. In valuing the management contract, he has applied the same method as he did under his section 367 argument and he has similarly determined the minimum value of the contract as $13,718,812. See note 37. Petitioner argues that in fact it owned no stock in LTD directly so it did not receive any stock as compensation for services. LTD's stock was issued to HCI One, petitioner's first-tier subsidiary in the Cayman Islands, "for cash at par, not to petitioner." Moreover, petitioner asserts that LTD has paid "over $8,000,000 as compensation for services" petitioner performed for LTD during 1973-80.

---

would thus work for nothing for 7 years. That objection is baseless since the income stream Cox was valuing was the net profit for the 7 years. Petitioner's expert concluded that the contract had no fair market value which is equally suspect. Hutts testified that he had recently purchased a hospital management contract for 3.8 percent of the gross receipts and testified that a well-negotiated management contract that had a reasonable profit could be sold for between 3 and 4 percent of the gross fees for the contract. A rate of 4 percent of the gross management fees of $49,281,061 results in a value of $1,971,242. We think that the contract's value would be at least that amount. Moreover, petitioner has the burden of proof on the valuation issue. While it has proved that respondent's value is incorrect, petitioner has not persuaded us that the contract has no fair market value. In fact, we find it inherently incredible that petitioner would argue that the contract had zero value, when petitioner paid Joe Dini a finder's fee of some $400,000 just for the introductions that gave it a chance to pursue this business opportunity. Moreover, in assessing the risks, Hutts failed to give adequate consideration to the fact that LTD was paid in advance by the Royal Cabinet and to the contract terms permitting retrospective price increases for the variable expense items. Also, the fact that LTD entered into a subcontract with SCICON in 1973 in an amount of $6,098,614, which presumably included some profit element for SCICON, hardly suggests the KFSH management contract had zero value. Granted that subcontract was based on LTD's being paid, but LTD was paid in advance before it rendered services. While there no doubt were some risks, the Court cannot find that a contract with the Royal Cabinet of the Kingdom of Saudi Arabia was so risky as to have no value. Using our best judgment under *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), and bearing heavily against petitioner, we would value the contract at $9 million as of Sept. 1, 1973. We repeat our statement in *Messing v. Commissioner*, 48 T.C. 502, 512 (1967), that valuation is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement" and also reiterate that "the issue is more properly suited for the give and take of the settlement process than adjudication." *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 451 (1980); *Messing v. Commissioner, supra.*

The argument that petitioner received stock in exchange for services is not mentioned in respondent's statutory notice of deficiency. It is thus a "new matter" within the meaning of Rule 142(a). Respondent bears the burden of proof and has not carried that burden. Respondent has not persuaded us that his determination of the value of the contract is correct. See note 37. Also, respondent has not persuaded us that the present value of the entire KFSH management contract properly measures the value of petitioner's services to LTD. We think this represents another attempt by respondent to disregard the separate corporate existence of LTD. In any event, we think this case is more properly analyzed under section 482 and we hold that section 482 requires an allocation of a portion of LTD's income to petitioner because of services it performed in negotiating the contract and assistance it provided to LTD in performance of the contract.

## IV. SECTION 482 ALLOCATION

Respondent's final argument is that all of LTD's taxable income for 1973 in the amount of $1,787,030 should be allocated to petitioner pursuant to section 482.[38] Section 482 authorizes respondent to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among organizations owned or controlled by the same interests, if he determines that such is necessary in order to prevent the evasion of taxes or clearly to reflect the income of the organizations. As a logical shortcut to allocating gross income and deductions, respondent, in certain instances, may also allocate net income. *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. at 621; *Ach v. Commissioner*, 42 T.C. 114, 126 (1964), affd. 358 F.2d 342 (6th Cir. 1966); *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. 821, 834 (1964); *Ballentine Motor Co. v. Commissioner*, 39 T.C. 348, 358 (1962),

---

[38]SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

affd. 321 F.2d 796 (4th Cir. 1963). We think respondent properly may do so in this instance.

One of the reasons for the enactment of section 482 and its predecessors was to prevent the evasion of taxes by shifting income from a domestic business to a foreign corporation controlled by the same interests. *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. at 621; *Asiatic Petroleum Co. (Delaware) Ltd. v. Commissioner*, 31 B.T.A. 1152, 1159 (1935), affd. 79 F.2d 234 (2d Cir. 1935), cert. denied 296 U.S. 645 (1935). The regulations state that "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Sec. 1.482–1(b)(1), Income Tax Regs.; *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972).

Section 482 thus permits respondent to examine dealings between controlled corporations and make allocations so as to place these dealings on the same basis for tax purposes as if they had taken place between independent and uncontrolled taxpayers. *Achiro v. Commissioner*, 77 T.C. 881, 896–897 (1981). On the other hand, if the dealings between controlled organizations are fair and equivalent in result to arm's-length bargaining, no allocation is authorized. *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. at 835; *Ballentine Motor Co. v. Commissioner*, 39 T.C. at 357. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482–1(b)(1), Income Tax Regs. The regulations also provide that "Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes." Sec. 1.482–1(c), Income Tax Regs.

Petitioner and LTD were controlled by the same interests. Section 1.482–1(a)(3), Income Tax Regs., provides that the control may be direct or indirect, whether legally enforceable and however exercisable or exercised. Petitioner had control over LTD since LTD was a second-tier subsidiary of petitioner. Moreover, the same individuals who were officers and directors of LTD were also officers and directors of petitioner. The

conclusion is inescapable that the requisite control was present.

Section 482, however, does not permit allocation merely because the common interests have the power to shift income. A reallocation under section 482 must be based on actual shifting of income. *Your Host, Inc. v. Commissioner*, 58 T.C. 10, 25 (1972), affd. 489 F.2d 957 (2d Cir. 1973); *V. H. Monette & Co. v. Commissioner*, 45 T.C. at 37; *Bush Hog Manufacturing Co. v. Commissioner*, 42 T.C. at 725. We must therefore examine whether there has been a shifting of income between LTD and petitioner.

Respondent enjoys broad discretion in his application of section 482. *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965); *Foster v. Commissioner*, 80 T.C. 34, 142, 143 (1983). Our review of his determination is limited. *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. at 833. Respondent's determination must be sustained unless we find an abuse of discretion—that his determination is unreasonable, arbitrary, or capricious. *Your Host, Inc. v. Commissioner*, 489 F.2d 957, 960 (2d Cir. 1973); *Foster v. Commissioner*, 80 T.C. at 143, 144; *Ach v. Commissioner*, 42 T.C. at 125-127; *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. at 833; *Grenada Industries, Inc. v. Commissioner*, 17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (5th Cir. 1953). Whether respondent has abused his discretion is a question of fact. *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963); *Foster v. Commissioner*, 80 T.C. at 160, 178. We must examine all of the facts and circumstances to determine whether respondent has abused his discretion.[39]

Respondent, both in his deficiency notice and on brief after the trial in this Court, allocated all of LTD's taxable income to

---

[39]Petitioner terminated the special agreement extending the limitations period and thus precipitated the issuance of the statutory notice of deficiency before a thorough examination and development of the facts had been completed by respondent. Petitioner refused to produce documents, resulting in a summons enforcement proceeding that petitioner appealed to a Circuit Court of Appeals without success. However, the proceedings in this Court are de novo, and the Court is satisfied that by the end of the trial, respondent had had ample opportunity to develop the record in this case. Thereafter, in his requested findings of fact, respondent's counsel ignored Rule 151(e)(3), Tax Court Rules of Practice and Procedure. That Rule requires that proposed findings of fact "consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law." Respondent's requested findings of fact frequently consisted of long quotations from documents, with no indication as to the essential fact the Court was being asked to find. This did not assist the Court in its resolution of this case.

petitioner. By allocating 100 percent of LTD's taxable income to petitioner, respondent has attempted in still another fashion to resurrect his argument that LTD is a "sham" corporation that should not be recognized for tax purposes. Respondent's argument under all of the theories that he has presented is that petitioner could as well have done the things that LTD did and therefore could have received all earnings from the King Faisal Hospital management contract. Since petitioner could have had these earnings, respondent would make it so by exercising his authority under section 482. We answer the argument as we did in *Seminole Flavor Co. v. Commissioner*, 4 T.C. 1215, 1235 (1945), and *Koppers Co. v. Commissioner*, 2 T.C. 152, 158 (1943): petitioner did not do this. Petitioner organized a separate corporation to contract with the Royal Cabinet of the Kingdom of Saudi Arabia to manage the King Faisal Hospital. We have held that LTD is a valid corporate entity that is to be recognized for tax purposes. In these circumstances, section 482 does not authorize an allocation that would in effect disregard the separate corporate existence of LTD. *Keller v. Commissioner*, 77 T.C. 1014, 1024 (1981), on appeal (10th Cir., Apr. 2, 1982). Moreover, section 1.482-1(b)(3), Income Tax Regs., states that section 482 is not intended to effect an allocation as would produce a result equivalent to a computation of consolidated taxable income. See also *Seminole Flavor Co. v. Commissioner*, 4 T.C. at 1232. We therefore hold that to the extent respondent attempted to shift all of LTD's taxable income to petitioner under section 482, his determination is arbitrary and capricious. *Keller v. Commissioner*, 77 T.C. at 1025.

Respondent has cited three cases in which a 100-percent allocation of income was sustained: *Cobo Cleaners Co. v. United States*, an unreported case (E.D. Mich. 1975, 36 AFTR2d 75-5147, 75-2 USTC par. 9592), affd. 535 F.2d 1253 (6th Cir. 1976); *Marc's Big Boy-Prospect, Inc. v. Commissioner*, 52 T.C. 1073 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner*, 452 F.2d 137 (7th Cir. 1971), and *Hamburgers York Road, Inc. v. Commissioner, supra.*[40] We find those cases distinguishable on their facts from this case.

---

[40]In *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. 821 (1964), and *Marc's Big Boy-Prospect, Inc. v. Commissioner*, 52 T.C. 1073 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v.*

Here, LTD, through Frayer, its employee and the executive director of the KFSH, had greater independence than the separate corporations in the three cases upon which respondent relies. In *Cobo Cleaners Co. v. United States, supra,* all operations of Cobo-Rumar, the department store dry cleaning corporation, were conducted daily under the direct supervision and control of Cobo Cleaners. All dry cleaning, pressing, pickups, and deliveries were conducted by Cobo Cleaners. Coco-Rumar was not independent from Cobo Cleaners in any way. Thus, the District Court sustained the 100-percent allocation of Cobo-Rumar's net income to Cobo Cleaners.

Similarly, in *Marc's Big Boy-Prospect, Inc. v. Commissioner, supra,* we sustained a 100-percent allocation of the net income of several Big Boy Restaurants, which were set up as separate corporations to WBB, the dominant corporation. In that case, too, WBB exercised complete control over the daily operations of the other restaurant corporations.

In *Hamburgers York Road, Inc. v. Commissioner, supra,* we sustained a 100-percent allocation of all of the taxable income of a newly organized corporation operating a suburban clothing store to its sister corporation, which operated a well-established downtown clothing store. Here, too, all day-to-day operations of the suburban store corporation were directly controlled by the downtown store corporation.

Petitioner in Nashville, Tenn., did not exercise day-to-day control over LTD's operations at the King Faisal Hospital in Riyadh, Saudi Arabia. That control was exercised by LTD. We think that this factor is sufficient reason for us to reject respondent's 100-percent allocation under section 482.

Even though we have rejected respondent's 100-percent allocation of taxable income from LTD to petitioner, the evidence indicates overwhelmingly that an allocation is necessary and proper in this case. *Nat Harrison Associates, Inc. v. Commissioner,* 42 T.C. at 618; *Ach v. Commissioner,* 42 T.C. at 126. Unfortunately, there is little quantitative evidence in this record upon which we can determine what a reasonable allocation of profits would be. Neither party has been particu-

*Commissioner,* 452 F.2d 137 (7th Cir. 1971), respondent relied on both sec. 61 and sec. 482. Since we analyzed the facts in both cases pursuant to sec. 482, we did not consider the issues under a sec. 61 analysis.

larly helpful to the Court in this regard. However, we must do the best we can with what we have. See *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. at 622.

The regulations provide as a general rule that where one member of a group of controlled entities performs services for the benefit of another member without charge or at a charge which is not at arm's length, appropriate allocations may be made to reflect an arm's-length charge for the services. Sec. 1.482–2(b), Income Tax Regs. The regulations also provide that where intangibles are made available in any manner by one member of a group of controlled entities to another member of the group for other than arm's-length consideration, an allocation can be made to reflect arm's-length consideration for the use of the intangibles. Sec. 1.482–2(d), Income Tax Regs.

Neither petitioner nor respondent has made any attempt to define specific services rendered by petitioner to LTD, to define LTD's use of intangibles belonging to petitioner, or to establish arm's-length charges for either. Petitioner argues that the only services that could arguably be said to have been performed by petitioner for LTD during 1973 were in the negotiations of the management contract and in the guarantee. Petitioner further argues that LTD reimbursed petitioner for all of the travel expenses of petitioner's personnel who went to London, Geneva, and Riyadh in 1973, and also reimbursed petitioner for the finder's fee that was paid to Joe Dini. Petitioner also argues that any services which it did perform were merely supervisory services of a parent with respect to a subsidiary that are not subject to allocation under section 482. *Young & Rubicam, Inc. v. United States*, 187 Ct. Cl. 635, 656, 410 F.2d 1233, 1245 (1969).

The evidence, however, indicates that in 1973, petitioner performed substantial services for LTD within the meaning of section 1.482–2(b), Income Tax Regs., and that it made available to LTD the use of its intangibles within the meaning of section 1.482–2(d)(3), Income Tax Regs. Petitioner played an active role in the contract negotiations. In formulating the contract proposal, some of petitioner's personnel, particularly hospital administrators and accountants, worked under the direction of Todd. These people were paid by petitioner but performed services for LTD. No payments were made to petitioner for these services. Once the contract had been

executed, Frayer was notified of his appointment as executive director of the King Faisal Hospital. He began performing services for LTD after September 14, 1973, but he was not put on LTD's payroll until November 1, 1973. During this time, he worked on the staffing pattern to be presented to Dr. Rifat in November. He received assistance from employees at petitioner's Coliseum Park Hospital in formulating the staffing plan, and he also received their assistance in ordering supplies and equipment. There is no question that these services were performed for LTD, but LTD did not make any payments to petitioner for these services.

In 1973, petitioner sent Whitten, Oscar, and Carbone to London to meet with SCICON representatives concerning the King Faisal Hospital. These individuals received a total consulting fee of $75 per day plus reimbursement of their expenses. The hospitals that employed them were also reimbursed an amount equal to the employee's salary for the number of days the employee was unavailable. There is no evidence that these charges were equivalent to arm's-length charges.[41]

Petitioner also made available to LTD the use of intangibles. Section 1.482–2(d)(3), Income Tax Regs., defines intangibles as follows:

---

[41]On the contrary, the evidence indicates that these charges were not at arm's length. A formal contract between LTD and petitioner was executed in 1975 purportedly to document an oral agreement under which the parties had allegedly been operating since Jan. 1, 1974. See note 30. Under the terms of this contract, LTD agreed to pay petitioner an amount equal to 3 times the daily salary of petitioner's employees for services performed outside the continental United States. These charges were allegedly equivalent to arm's-length charges. Even assuming that the amount is equivalent to those an arm's-length agreement would produce, and there is no evidence to so establish, LTD still did not pay that amount. Much of the confusion in this case arises from the multiple roles of the officers and directors of petitioner. For example, Neff, as president of both LTD and petitioner, was asked on cross-examination about the alleged oral agreements between LTD and petitioner:

Q. You had oral agreements as—as—let me—now, here I don't try to trick you, but how do you make an oral agreement between yourself as president of Ltd. and president of HCA? Do you just make a decision? Or do you discuss it—

A. I just make a decision.

While the identity of interest is not controlling, petitioner has not produced evidence of prices and terms which would have resulted had these services been performed for an unrelated party. See *Engineering Sales, Inc. v. United States*, 510 F.2d 565, 569 (5th Cir. 1975). Even under the written intercompany agreements that were executed in 1975 (see note 30), there is no evidence in the record to establish that the prices in those intercompany agreements were reasonable and represented arm's-length charges.

(3) *Definition of intangible property.* (i) Solely for the purposes of this section, intangible property shall consist of the items described in subdivision (ii) of this subparagraph, provided that such items have substantial value independent of the services of individual persons.

(ii) The items referred to in subdivision (i) of this subparagraph are as follows:

(a) Patents, inventions, formulas, processes, designs, patterns, and other similar items;

(b) Copyrights, literary, musical, or artistic compositions, and other similar items;

(c) Trademarks, trade names, brand names, and other similar items;

(d) Franchises, licenses, contracts, and other similar items;

(e) Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists, technical data, and other similar items.

In contracting with LTD for the management of the King Faisal Hospital, the Royal Cabinet of the Kingdom of Saudi Arabia definitely looked to petitioner's experience and expertise. At the outset in the contract negotiations, petitioner was told to emphasize in its proposals HCA's experience and expertise. Later, LTD's name was changed from Hospital Corp. of the Middle East, Ltd., to Hospital Corp. of America, Ltd., because the Saudi Arabian officials wanted an "American flavor." The management contract itself is replete with references to and discussions of HCA's experience and expertise in the management of 51 hospitals in the United States. Also the KFSH management contract expressly required that petitioner guarantee LTD's performance of the contract.

As noted above, petitioner's expertise was specifically referenced in the contract. For example, the contract stated that petitioner had the capability to staff and assume management of operations of the hospital. The contract stated that LTD would make available to all personnel employed at the KFSH the full facilities of the U.S. hospitals owned and operated by petitioner for specialized continuing education programs. Representations in regard to Schedule A,3 of the contract stated that petitioner was well-managed financially and that it was able to forecast yearly operational costs within a 1-percent tolerance through use of its detailed computerized budget planning system. The contract stated that "Hospital Corporation of America, Ltd. has utilized the experience outlined above to estimate the operational supply costs of the King Faisal Specialist Hospital in a full operating year for the hospital, at present day values." These estimates were in part

based on 1973 year-to-date operational costs from Los Robles Hospital, which was represented to be petitioner's most sophisticated hospital, but which did not equal the sophistication of the King Faisal Hospital. In estimating Schedule B variable expense items too, LTD used all of petitioner's experience, including estimates from the Los Robles Hospital. Moreover, it was because of petitioner's "acknowledged efficiency in hospital operations" that a lower inflationary factor was used for the price-escalation provisions of the contract. The contract contained statements that in carrying out the contract, LTD would use "the extensive experience of Hospital Corporation of America." We think that LTD used these intangibles and therefore an allocation is proper. Sec. 1.482–2(d), Income Tax Regs.

While petitioner has attempted to persuade us that it has no "system" that LTD could use, that attempt has not been successful. Indications of petitioner's system have permeated the entire record in this case. Petitioner's 1973 annual report gives a good indication of what petitioner saw as its management system. The "combination of medical-financial-administrative orientation and skills at all levels of the management structure provides the ideal combination for the effective management of hospitals. It is unique within the health care industry and is one of the company's most important competitive advantages." Petitioner's interim report for 9 months ended September 30, 1974, also refers to petitioner's system:

> Systems of monitoring and control have been perfected through the use of budgets, operating indicators and quality guidelines, which permit continuing evaluation of operating results at all facilities. Instant recognition of operating variances facilitates timely corrective action. These systems have resulted in dependable and predictable operating results through the hospital group.

We conclude that petitioner made its system available to LTD in both the negotiations for and the performance of the management contract for the King Faisal Hospital. There is no indication that LTD paid petitioner for the use of the system. Therefore an allocation is proper. Sec. 1.482–2(d), Income Tax Regs.

With undue modesty, petitioner has tried to suggest to this Court that its much-vaunted expertise and experience is a mere nothing: just setting up another corporation and install-

ing an executive director or hospital administrator to run the hospital practically on his own. However, Frayer, the executive director of the King Faisal Hospital, candidly testified that while he was receiving a salary of $244,000 a year to run the hospital, he would not undertake to do the job on his own for $500,000 a year. Even discounting some of the sales puffery inherent in annual reports to stockholders or in sales pitches to secure hospital management contracts, we are persuaded that petitioner had a system involving considerable expertise and experience. While petitioner in 1973 admittedly did not have any prior experience in international operations, LTD at that time had no experience and no track record in either domestic or international hospital management. HCA's president, Mr. Neff, testified that "we felt that in the long run HCA had an enormous expertise that we could take into the foreign marketplace and if there was anybody who could be of help it was us." We are satisfied that what the Royal Cabinet of the Kingdom of Saudi Arabia contracted for and in large part received was HCA's expertise and experience, particularly during the year 1973.

Since petitioner performed substantial services for LTD and permitted LTD to use its system without compensation, there was a substantial distortion of income. We have found that LTD had an existence separate and apart from petitioner and that LTD's employees, Todd and Frayer, had the day-to-day responsibilities for preparing in 1973 to commence performing the KFSH management contract. Some of the 1973 profits are attributable to their efforts. However, the most important factor in earning those profits was petitioner's managerial expertise and experience which were readily available to and used by LTD. Using our best judgment on the lengthy but inconclusive record before us, we have concluded and found as a fact that 75 percent of the taxable income of LTD in 1973 was attributable to petitioner.[42] *Ach v. Commissioner*, 42 T.C.

---

[42]The evidence in this case covers the years up to 1980 and both parties at trial and on brief have addressed the later years in some detail, apparently each trying in some way to forestall or at least color future events. However, this opinion deals only with the year 1973. There is insufficient evidence in the record to determine whether or not the payments between petitioner and LTD in 1974 and subsequent years represent arm's-length charges. We make no determination as to whether an allocation under section 482 may be required for later years and, if required, what a proper basis for such allocation may be.

at 126, 127. Cf. *Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930). We therefore hold that respondent erred in allocating the remaining 25 percent to petitioner.

*Decisions will be entered under Rule 155.*